[No. F023017. Fifth Dist. June 20, 1996.]

HENRY VOSS, as Secretary, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF TULARE COUNTY, Respondent;
WILEMAN BROS. & ELLIOTT, INC., et al., Real Parties in Interest.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I.

COUNSEL

Daniel E. Lungren, Attorney General, Charles W. Getz III, Assistant Attorney General, and Edna Walz, Deputy Attorney General, for Petitioners.

No appearance for Respondent.

Thomas E. Campagne and Clifford C. Kemper for Real Parties in Interest.

OPINION

**DIBIASO, Acting P. J.**—We hold that section 14 of the Food and Agricultural Code expressly exempts the issuance of marketing orders under the California Marketing Act of 1937 (Food & Agr. Code, § 58601 et seq.) from all of the requirements of the California Administrative Procedure Act (Gov. Code, § 11346 et seq.).

### FACTS AND PROCEDURAL HISTORY

In 1993, a group of plum growers and handlers calling themselves the "Stone Fruit Coalition" approached the California Department of Agriculture (Department), provided it with a proposed mandatory California plum marketing order, and requested that the order be issued pursuant to the provisions of the California Marketing Act of 1937 (CMA). The proposed marketing order set out a plum marketing program to be administered by the Department.

A "marketing order" is an order issued by the Secretary of the Department (secretary) (see Food & Agr. Code, §§ 35, 50, 58741) "pursuant to" the CMA that "prescribes rules and regulations that govern the processing, distributing, or handling, in any manner of any commodity within [California] during any specified period." (Food & Agr. Code, §§ 58615, 58741, 58742.) A "commodity" for purposes of the CMA includes (but is not limited to) agricultural produce grown in California. (Food & Agr. Code, § 58605.) A "producer" of an agricultural commodity is one who grows it. (Food & Agr. Code, § 58620.) A "distributor" is one who sells, markets, or distributes the commodity in intrastate commerce but (with one exception) is not a retailer. (Food & Agr. Code, § 58608.) A "processor" is one who prepares the commodity for the market or for marketing. (Food & Agr. Code, § 58619.) A "handler" is either a "distributor" or a "processor." (Food & Agr. Code, § 58611.) " 'Producer marketing' " means "all operations . . . performed by any producer in preparing for market." (Food & Agr. Code, § 58621.)

Among other terms, the proposed plum marketing order provided for the establishment of the California Plum Marketing Board (Board), consisting of 13 plum growers and handlers, to assist the secretary in administering the plum marketing program.[1] Under the terms of the proposed order, the Board's authority would include, subject to the approval of the secretary: (1) the pursuit of research and development studies pertaining to the production and distribution of plums; (2) the conduct of advertising and sales promotion programs relating to plums; (3) the investigation of economic and marketing conditions affecting plums; (4) the recommendation of grade and quality standards for plums, provided such standards were not "lower than any existing State or Federal regulations"; (5) the making of arrangements for the inspection and certification of plums for compliance with prevailing grade and quality standards; (6) the recommendation of budgets for the administration and enforcement of the program; and (7) the recommendation of assessment rates, "sufficient to provide adequate funds to defray the proposed expenditures and reserves as set forth in the budgets." The proposed order also set minimum maturity standards for plums and directed

---

[1]Food and Agricultural Code section 58841, reads in part that "[a]ny marketing order which is issued pursuant to [the CMA] shall provide for the establishment of an advisory board to assist [the secretary] in the administration of any marketing order." Other provisions of article 8 (commencing with Food & Agr. Code, § 58841) of the CMA concern such topics as the composition of the members of an advisory board and their appointment, term of office, compensation, and powers and duties. The members of an advisory board represent the agricultural industry covered by the marketing order they help to administer. (Food & Agr. Code, § 58852.) An advisory board is required to report on an annual basis to the "members of the industry who are subject to its marketing order on the activities and program, including, but not limited to, the income and expenses, the fund balance, and a report of progress in achieving program goals." (Food & Agr. Code, § 58846.5.)

how assessments levied upon producers would be paid, collected and, if applicable, refunded. In addition, the order prescribed the maximum assessment levels for the component activities authorized by the proposed order; for example, the assessment for sales promotion and marketing development activities could not exceed 11 cents per 28-pound box of plums.

Acting in apparent compliance with procedures prescribed by the CMA, the Department issued the mandatory plum marketing order. In doing so, however, the Department did not follow any of the procedures described in the California Administrative Procedure Act (APA).

Real parties in interest Wileman Bros. & Elliott, Inc., and Kash, Inc. (hereinafter referred to collectively as Wileman) are producers and handlers of plums. Wileman brought suit against petitioners Henry Voss, as Secretary of the State of California Department of Food and Agriculture, and the Department itself (hereinafter collectively referred to as the Department). The Wileman complaint pled seven separate causes of action. In relevant part, the first, second and fifth causes of action alleged the Department had failed to comply with the APA. The Department's answer to the complaint denied any such "failure" on its part; according to the Department, the APA did not apply in any respect to the promulgation of the plum marketing order.

Wileman moved for summary judgment or, in the alternative, summary adjudication with respect to the first, second and fifth causes of action of its complaint. Wileman argued the mandatory plum marketing order was invalid because in issuing it the Department was required to, but did not, follow certain of the procedures set out in the APA. It was undisputed that the Department ignored the APA in issuing the plum marketing order.

The superior court judge, on his own motion, "bifurcated" the first, second and fifth causes of action from the others. He then granted Wileman's motion for a summary judgment as to the segregated counts and ultimately entered a "judgment" in favor of Wileman on the three bifurcated causes of action. The Department appealed from this "judgment" entered in favor of Wileman on the first, second and fifth causes of action.

We will dismiss the Department's appeal as having been taken from an invalid, nonappealable judgment. (*Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725 [29 Cal.Rptr.2d 804, 872 P.2d 143].) We will, however, treat the purported appeal as a petition for writ of mandate (*id.* at pp. 744-745) and grant it.

Discussion

I.*

. . . . . . . . . . . . . . . . . . . . . . . .

II.

The Department contends the trial court erred in concluding that issuance of the plum marketing order was subject to various provisions of the APA. It maintains that compliance with the CMA was all that was required of it.

A. *The CMA*

■ The CMA constitutes a legislative entrustment of the power to regulate the marketing of agricultural commodities to those who produce or otherwise deal with such products, subject to the approval of the secretary. (Shimomura, *A New Look at the California Marketing Act of 1937* (1972) 5 U.C. Davis L.Rev. 190, 198.) It grew out of the chaotic conditions which characterized California agriculture during the early part of the twentieth century. (*Id.* at pp. 196-198.) Before the promulgation of the CMA, each of California's many fruit and vegetable growers attempted to be the first in the market with his or her commodity, in order to take advantage of the premium prices paid on early shipments. This led to the marketing of inadequately ripened produce, and the glutting of the market during the peak season with poor quality commodities. Deceptive packaging, improper sampling, and false grading were often resorted to in order to attempt to enhance the attractiveness of the produce. This "unregulated scramble" had an "adverse effect upon consumer acceptance of California fruits and vegetables," and the unstable and fluctuating markets "had an exaggerated impact on the livelihood of" the state's agricultural producers. (*Id.* at pp. 196-197.) The depression of 1929-1933 only exacerbated these problems; the prices paid to growers "plummeted." (*Id.* at p. 198.)

In enacting the CMA, the Legislature found there existed "unreasonable and unnecessary economic waste of the agricultural wealth of" California caused by, among other things, the "disorderly marketing of such commodities," the "lack of uniform grading and classification of commodities," "unfair methods of competition in the marketing of commodities," and the "inability of individual producers to maintain present markets or to develop new or larger markets for California-grown commodities." (Food & Agr. Code, § 58651.) According to the Legislature, these conditions "jeopardize

---

*See footnote, *ante*, page 900.

the future continued production of adequate supplies of food, fiber, and other products of the farm . . . and prevent producers from obtaining a fair return from their labor, their farms, and the commodities which they produce." (*Ibid.*)

The purpose of the CMA is to: [¶] "(a) Enable the producers of this state . . . to correlate more effectively the marketing of their commodities with market demands for those commodities. [¶] (b) Establish orderly marketing of commodities. [¶] (c) Provide for uniform grading and proper preparation of commodities for market. [¶] (d) Provide methods and means for the maintenance of present markets, or for the development of new or larger markets, for commodities that are grown within this state or for the prevention, modification, or elimination of trade barriers that obstruct the free flow of those commodities to market. [¶] (e) Eliminate or reduce economic waste in the marketing of commodities. [¶] (f) Restore and maintain adequate purchasing power for the producers of this state. [¶] (g) Inform the general public of the processes of producing agricultural commodities. [¶] [and] (h) Foster cooperation and understanding between urban and rural sectors of society." (Food & Agr. Code, § 58654; see also Food & Agr. Code, § 58652; *Brock* v. *Superior Court* (1952) 109 Cal.App.2d 594, 598 [241 P.2d 283].)

To assist in promoting these aims, article 6 (commencing with Food & Agr. Code, § 58771), article 9 (commencing with Food & Agr. Code, § 58881), and article 16 (Food & Agr. Code, § 59111) of the CMA describe the specific procedures essential to the issuance of a marketing order. The issuance of a marketing order by the secretary is an exercise of quasi-legislative power. (*Brock* v. *Superior Court, supra,* 109 Cal.App.2d at pp. 597-598.)

B.   *The APA*

■   The APA is intended to advance "meaningful public participation in the adoption of administrative regulations by state agencies" and create "an administrative record assuring effective judicial review." (*California Optometric Assn.* v. *Lackner* (1976) 60 Cal.App.3d 500, 506 [131 Cal.Rptr. 744].) In order to carry out these dual objectives, the APA (1) establishes "basic minimum procedural requirements for the adoption, amendment or repeal of administrative regulations" (Gov. Code, § 11346) which give "interested parties an opportunity to present statements and arguments at the time and place specified in the notice and calls upon the agency to consider all relevant matter presented to it," and (2) "provides that any interested person may obtain a judicial declaration as to the validity of any regulation by bringing an action for declaratory relief in the superior court." (*California*

*Optometric Assn.* v. *Lackner, supra,* 60 Cal.App.3d at pp. 505-506.) The APA was born out of the Legislature's perception there existed too many regulations imposing greater than necessary burdens on the state and particularly upon small businesses.

### C. *Issue/Holding*

Both the APA and the Food and Agricultural Code include specific statutes—Government Code section 11346 and Food and Agricultural Code section 14, respectively—which bear upon whether the APA applies to the issuance of a marketing order under the CMA. ▮▮▮ Originally enacted in 1947, what is now section 11346 of the Government Code read in relevant part, at the time the plum marketing order was issued, as follows: "[With an exception not applicable here], the provisions of [the APA] are applicable to the exercise of any quasi-legislative power conferred by any statute heretofore or hereafter enacted, but nothing in [the APA] repeals or diminishes additional requirements imposed by any such statute. The provisions of [the APA] shall not be superseded or modified by any subsequent legislation except to the extent that such legislation shall do so expressly."

Thus, another statute will supplant or limit the APA when two conditions are met. One, the other statute directing that the APA be supplanted or limited must have been enacted after 1947. (*Engelmann* v. *State Bd. of Education* (1991) 2 Cal.App.4th 47, 59 [3 Cal.Rptr.2d 264].) Two, the other statute must disclose an express intention to supplant or limit the APA. (*Ibid.*)

What is now Food and Agricultural Code section 14, enacted in 1957, is such a statute. It provides in part as follows: "Wherever, pursuant to this code, any state department, officer, board, agency, committee, or commission is authorized to adopt rules and regulations, such regulations shall be adopted in accordance with [the APA] *to the extent that that chapter [the APA] is not specifically in conflict with the express terms of the provisions of this code which authorize the adoption of such regulations."* (Italics added.)

Both the Department and Wileman rely upon section 14 of the Food and Agricultural Code. According to the Department, the CMA constitutes a single, coherent scheme for the issuance of marketing orders and, hence, is "specifically in conflict" in its entirety with the separate system for the enactment of administrative regulations found in the APA. According to Wileman, many of the individual requirements of the APA are not "specifically in conflict" with the CMA and therefore should have been adhered to

by the Department before issuing the plum marketing order.[2] The underlying premise of Wileman's argument is that a "specific conflict" within the meaning of Food and Agricultural Code section 14 is present only when a particular requirement of the APA is utterly irreconcilable with one or more provisions of the CMA. For example, Wileman maintains the secretary should have followed the APA command that notice of the date and time of the comment/hearing procedures be published in the California Regulatory

[2]In fact, Wileman points to more than 40 separate provisions of the APA which Wileman claims are not irreparably antagonistic to any part of the CMA. The following alleged omissions by the Department are among the many singled out by Wileman:

(1) Failure to provide notice to a representative number of small business enterprises or their representatives who were identified as being affected (Gov. Code, § 11346.4, subd. (a)(3));

(2) Failure to publish notice of the hearing on the proposed order in the California Regulatory Notice Register (Gov. Code, § 11346.4, subd. (a)(5));

(3) Failure to include in the notice of hearing (a) a reference to the authority under which the marketing order was proposed; (b) an informative digest containing a concise and clear summary of the existing laws and regulations and the relationship and impact of the proposed marketing orders to existing law (Gov. Code, § 11346.5, subd. (a)(3)); (c) a statement of the estimated cost to the Department to institute and maintain the marketing order (Gov. Code, § 11346.5, subd. (a)(6)); (d) an identification of the types of businesses affected by the marketing order (Gov. Code, former § 11346.53, subd. (a)(2)(A)); (e) an explanation of all the studies conducted and relied upon in determining that the marketing order would satisfy the purpose of the CMA (Gov. Code, former § 11346.53, subd. (b)); (f) a factually supported declaration that the proposed marketing order will not have a significant adverse economic impact on businesses; (Gov. Code, former § 11346.53, subd. (c)); (g) an estimate of the potential cost impact of the proposed regulations on all persons and businesses affected (Gov. Code, former § 11346.53, subd. (e));

(4) Failure to assess whether and to what extent the proposed marketing order will effect (a) the creation or elimination of jobs within the State of California (Gov. Code, § 11346.54, subd. (a)(1)), (b) the creation of new businesses or the elimination of existing businesses within the state of California (Gov. Code, § 11346.54, subd. (a)(2)), and (c) the expansion of businesses currently doing business within the State of California (Gov. Code, § 11346.54, subd. (a)(3));

(5) Failure to provide the Office of Administrative Law with the notice as well as with (a) a copy of the express terms of the proposed marketing order (which must be made available to the public) (Gov. Code, former § 11346.7, subd. (a)); (b) a statement of the reasons for proposing the marketing order regulations, including a description of the problem which the regulations are intended to address (Gov. Code, former § 11346.7, subd. (a)(1)); and (c) a statement of reasons for the requested adoption of the marketing order, including a summary of each objection or recommendation regarding the proposed marketing order with an explanation of how the originally proposed marketing order was changed to accommodate each objection or recommendation or the reasons for making no change (Gov. Code, former § 11346.7, subd. (b)(3));

(6) Failure after the producer referendum vote approving implementation of the California plum marketing order to issue a statement providing findings of fact and/or conclusions in support of the imposition of the plum marketing order. (Gov. Code, § 11343);

(7) Failure to submit a copy of the plum marketing order to the Office of Administrative Law for filing with the Secretary of State (Gov. Code, § 11343); and

(8) Failure to request that the California Plum Marketing Order as approved be published in the California Code of Regulations (Gov. Code, § 11344).

Notice Register and mailed to those persons who have requested notice and those persons who may be interested in the regulation, as well as to a "representative number" of small businesses which have been identified as being affected by the proposed action, in order to promote the APA's concern that all persons or entities likely to be directly affected by the enactment of a regulation be timely apprised of its proposal. (Gov. Code, § 11346.4.) Wileman claims these requirements are not irreconcilable, and therefore not "specifically in conflict," with corresponding requirements of the CMA which ensure that all affected persons and entities receive actual notice of the proposed order and the hearing by requiring that the secretary mail written notice to every producer or handler who will be directly affected by the order. (Food & Agr. Code, § 58773.)

We decline to engraft any portion of the APA into the CMA. We conclude the Legislature did not intend Food and Agricultural Code section 14 to have the narrow meaning proposed by Wileman. We instead find the Legislature intended Food and Agricultural Code section 14 to expressly exempt the CMA from all of the provisions of the APA. The CMA constitutes a complete, rational and integrated scheme for the adoption of marketing orders which carries out the purposes of the CMA and meets the goals sought to be attained by the APA. Thus, we are satisfied, for the reasons which follow, that the APA is, in its entirety, *"specifically in conflict with the express terms of the provisions of [the CMA] which authorize the adoption of"* a marketing order. (Food & Agr. Code, § 14, italics added.)[3]

### D.   *Construction of Food and Agricultural Code Section 14*

The general rules which guide us in construing Food and Agricultural Code section 14 are familiar:

"First, we must examine the actual language of the statute, giving the words their ordinary, everyday meaning. [Citation.] If the words are reasonably free from ambiguity and uncertainty, the language controls. [Citations.] If the meaning of the words is not clear, we must take the second step and refer to the legislative history. [Citation.] 'The final step—and one which . . . should only be taken when the first two steps have failed to reveal clear meaning—is to apply reason, practicality, and common sense to the language at hand. If possible, the words should be interpreted to make them

---

[3]Our holding assumes a finding that a marketing order fits the APA's definition of a "regulation." (See Gov. Code, § 11342, subd. (g) [A regulation means "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of the state agency."].)

workable and reasonable [citations], in accord with common sense and justice, and to avoid an absurd result [citations].' [Citation.]" (*Jensen* v. *BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 122-123 [41 Cal.Rptr.2d 295].)

The "actual language" of Food and Agricultural Code section 14 settles nothing. (See *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 260 [104 Cal.Rptr. 761, 502 P.2d 1049].) It does not expressly say what the Department says it means. However, the actual language also does not compel us to adopt Wileman's proposed construction. The difficulty for Wileman is the Legislature's use of the word "conflict," which means "to show variance, incompatibility, irreconcilability, or opposition." (Webster's New Internat. Dict. (3d ed. 1986) p. 477.) Variance denotes merely a discrepancy or a difference (Webster's, *supra*, at p. 2533), while irreconcilability (Webster's, *supra*, at p. 1195) and incompatibility (Webster's, *supra*, at p. 1144) contemplate an impossibility or incapacity to be made consistent or to be harmoniously combined.

The presence of the word "conflict" in Food and Agricultural Code section 14 thus creates uncertainty. Related provisions of the APA and the CMA may specifically vary without being incompatible or irreconcilable. For example, both acts require an announcement of the adoption of a regulation; however, each prescribes different means for doing so. (Compare Gov. Code, §§ 11346.2 and 11344 with Food & Agr. Code, § 59111.) The APA's requirements that the adopted regulation be filed with the Secretary of State (Gov. Code, § 11346.2) and published in the California Code of Regulations (Gov. Code, § 11344) are different than, but are not incapable of being harmoniously combined with, the CMA's requirements that an issued marketing order be posted at the secretary's office and mailed to all persons who will be directly affected by the order or who have requested notice. (Food & Agr. Code, § 59111.) If the Legislature intended that a conflict between the APA and the CMA within the scope of section 14 of the Food and Agricultural Code meant simply the existence of a variance between the particular compared provisions of the two acts, then the APA provisions directing filing and publication should not be applied to the announcement of the issuance of a marketing order. However, if the Legislature intended the test to be irreconcilability or incompatibility between the contrasting requirements, as Wileman argues, then the APA provisions should be applied because a marketing order may be filed and published as well as posted and mailed.

■ Because there is no " 'single meaning of the statute apparent on its face, we are required to give it an interpretation based upon the legislative

intent with which it was passed.' " (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 256.) We therefore turn to an examination of the relevant legislative history. (*Jensen* v. *BMW of North America, Inc., supra,* 35 Cal.App.4th at pp. 122-123.)

In 1953, a state Senate subcommittee studied the rulemaking practices and procedures employed by state agencies, including those of the Department (then the Department of Agriculture). (See Sen. Interim Com. on Administrative Regulations, First Rep. (1955) pp. 5-14.) The subcommittee's report, issued in 1955, saw a need to standardize the procedures utilized by state agencies in enacting regulations. (*Id.* at pp. 5-11.) In part, the subcommittee found that several enabling statutes empowered agencies to adopt administrative rules or regulations for diverse purposes; it concluded such authorizations were insufficient to insure that an agency acted reasonably and within the proper scope of its statutory authority in implementing whatever rulemaking powers it may have possessed.[4] (*Id.* at pp. 5-7.)

The report of the subcommittee did not include any "recommendation to do away with established procedures of agencies which are in addition to the minimum requirements of the [APA]." (Sen. Interim Com. on Adminstrative Regulations, First Rep., *supra,* at p. 8.) The subcommittee instead proposed that the Legislature "specifically integrate the provisions of [the APA] into those statutes *which are silent* on procedures to be followed . . . ." (*Ibid.,* italics added.) The subcommittee therefore recommended that: "where a specific procedure to be followed in adopting regulations is not established for the particular agency, or if the procedure established inherently fails to give sufficient public protection and participation, . . . that agency [should] be directed to follow the Administrative Procedure Act in the adoption of regulations." (*Id.* at p. 64.)

In the subcommittee's view, enactment of its recommendations would "raise the minimum requirements where such are below those established in the [APA], and, . . . specify the additional requirements above and beyond the [APA's] requirements where a need for additional public protection exists or where such protection is desirable." (Sen. Interim Com. on Administrative Regulations, First Rep., *supra,* at p. 8.) With respect to the Food and Agricultural Code (then the Agricultural Code), the subcommittee suggested "a section be added . . . providing that regulations be adopted in accordance with the [APA], except as specifically modified by the [Food and Agricultural Code]." (*Id.* at p. 14.)

---

[4]For example, the statutes conferring rulemaking authority used such language as "appropriate to effectuate the purposes of," "reasonably necessary to carry out the provisions of," "proper to carry out the provisions of," and "necessary to effectuate the purposes of." (Sen. Interim Com. on Adminstrative Regulations, First Rep., *supra,* at p. 7.)

Two years later, the Legislature implemented the subcommittee's proposals as they applied to the Food and Agricultural Code by amending it in several respects. (Stats. 1957, ch. 1749, p. 3135.) Included in these modifications was the enactment of what is now Food and Agricultural Code section 14. (Stats. 1957, ch. 1749, § 2, p. 3135.) In addition, the sentence (or its equivalent) "[t]he [secretary] may make such rules and regulations as are reasonably necessary" was added to 10 sections of the Food and Agricultural Code. (Stats. 1957, ch. 1749, §§ 3, 4, 6, 7, 11, 20, 22, 26, 27, 28, pp. 3135-3136, 3139-3140.) Such language was not, however, inserted into the CMA.[5]

■ This history supports the Department's proposed construction of Food and Agricultural Code section 14 and refutes Wileman's claim that the Legislature intended the "specific conflict" to be present only when a term of the APA is found to be irreconcilable with a provision of the CMA. The 1957 legislation was calculated to effectuate the subcommittee's recommendation that the APA apply where a grant of rulemaking authority to an agency was either unaccompanied by procedural standards governing the implementation of the power by the agency or augmented with procedural standards that did not adequately protect the public or insure effective public participation in the rulemaking process. It follows that the Legislature intended Food and Agricultural Code section 14 to expressly exempt from the APA the Department's exercise of rulemaking authority when such rule making is governed by procedures that assure the desired public protection and participation, regardless of whatever extrinsic differences might exist between the separate components of the scheme and the APA.[6]

The next question, therefore, is whether the requirements of the CMA, taken as a whole, give the sought-after protection and participation to the

---

[5]The other legislative materials pertaining to chapter 1749 of the 1957 statutes are otherwise inconclusive for the same reason section 14 of the Food and Agricultural Code itself is ambiguous. At most, such materials relate that the statute "[d]eclares regulations adopted under [the Food and Agricultural Code] shall be adopted in accordance with [the APA] to extent not in conflict with express provisions of [the Food and Agricultural Code]." (Legis. Counsel's Rep., Sen. Bill No. 1591 (1957 Reg. Sess.) June 28, 1957.)

[6]We are satisfied that in carrying out the Legislature's intent we are not trespassing on the principle which forbids courts from doing violence to the language, or deviating from the text, of a statute in order to give it a meaning consistent with the perceived legislative intent but not disclosed by the words actually used in the statute. (*Andersen* v. *I. M. Jameson Corp.* (1936) 7 Cal.2d 60, 67-68 [59 P.2d 962]; *Unzueta* v. *Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1697 [8 Cal.Rptr.2d 614].) The word "conflict" has been used to refer to the occupation by one statutory scheme of a subject or jurisdiction to the exclusion of another statutory scheme which covers the same ground. Thus, for example, under the doctrine of preemption, "[l]ocal legislation in *conflict* with general law is void. *Conflicts* exist if [the local] ordinance duplicates [citations], contradicts [citations], *or enters an area fully occupied by general law*, either expressly or by legislative implication [citations]. If the subject matter or field of the legislation has been fully occupied by the state, there is no room for supplementary or complementary local legislation, even if the subject were otherwise one

public in the issuance of a marketing order (Sen. Interim Com. on Administrative Regulations, First Rep., *supra*, at p. 64).

E. *Evaluation of the CMA and the APA*

We believe the CMA, in the context of its purpose and goals, provides public protection and participation substantially equivalent to that afforded by the APA. In several respects the CMA essentially duplicates the APA. Both acts require that notice of the proposed action be given to affected persons and entities. (Gov. Code, § 11346.4; Food & Agr. Code, § 58771.) Both acts mandate that all relevant matter presented must be considered before adoption of the regulation or order (Gov. Code, § 11346.8; Food & Agr. Code, §§ 58784, 58812 [economic factors]), and that a complete record be kept of the evidence and testimony submitted (Gov. Code, § 11346.8; Food & Agr. Code, § 58782). Both acts also require that a material amendment of an issued regulation be accomplished by the same procedures utilized for the adoption of the regulation. (See Gov. Code, §§ 11346, former 11346.7; Food & Agr. Code, § 59021.) In addition, the APA compels the agency to investigate to determine the identity of the impacted persons and entities. (Gov. Code, § 11346.3.) Similarly, the CMA requires that the secretary take evidence at the hearing relating to the completeness and accuracy of the producer and handler lists maintained by the secretary as a record of those persons and entities likely to be affected by the issuance of a marketing order. (Food & Agr. Code, § 58774.) The CMA also permits the secretary to compel all handlers to provide necessary information about the handler and every producer who has dealt with the handler. (Food & Agr. Code, §§ 58775, 58777, 58778.)

Moreover, both the CMA and the APA require the disclosure of pertinent information. For example, the APA mandates that notice of proposed adoption of a regulation include an estimate of the cost to be incurred by the agency in instituting and maintaining the regulation (Gov. Code, § 11346.5, subd. (a)(6)), as well as the potential cost impact of the proposed regulation upon regulated persons and businesses (Gov. Code, former § 11346.53, subd. (e)). The notice and copy of the proposed marketing order furnishes equivalent information for purposes of the CMA. Each marketing order must

properly characterized as a ['local] affair.' [Citations]." (*Lancaster* v. *Municipal Court* (1972) 6 Cal.3d 805, 807-808 [100 Cal.Rptr. 609, 494 P.2d 681], italics added; see also *People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 484-485 [204 Cal.Rptr. 897, 683 P.2d 1150]; *Chavez* v. *Sargent* (1959) 52 Cal.2d 162, 176-178 [339 P.2d 801].)

We recognize that neither the subservience of local law to state law as an application of the doctrine of preemption nor the doctrine itself bears any relationship, by analogy or otherwise, to the problem of statutory construction we face in this case. We mention it here only to demonstrate the expansive connotation given to the word "conflict" by the lexicon of the law.

disclose what assessments will be made upon the affected persons and entities to support the issuance and administration of the marketing program put in place by the order. The CMA expressly limits the amount of these assessments. (Food & Agr. Code, §§ 58921, 58924-58926.)

In other aspects, the requirements of the CMA exceed those of the APA. The CMA requires that actual notice of the hearing on the adoption of a marketing order be given to all persons and entities likely to be directly impacted by the order. (Food & Agr. Code, § 58773; see *Paramount Citrus Assn.* v. *Jacobsen* (1958) 162 Cal.App.2d 147, 155 [328 P.2d 14].) The APA only requires the agency to attempt to notify by publication and partial mailing as many affected small businesses as possible of the proposed adoption of a regulation and, if an oral hearing will be held, to personally notify only "to the extent practicable" those that have specifically requested notice. (Gov. Code, § 11346.8.) Of similar comparison are the means prescribed in the two acts for announcing the adoption of a regulation. Under the APA this step is accomplished by filing the regulation with the Secretary of State (Gov. Code, § 11346.2) and publishing it in the California Code of Regulations (Gov. Code, § 11344). Although the announcement of the issuance of a marketing order is brought about in part by posting the order at the secretary's office, the CMA also mandates that a copy of the notice of issuance be *mailed to* "*every* person that is directly affected by the terms of [the] marketing order" that is identified in the files of the secretary and to *every* person who has requested such notice. (Food & Agr. Code, § 59111, italics added.) Finally, the CMA requires a public hearing (Food & Agr. Code, § 58782; *Paramount Citrus Assn.* v. *Jacobsen, supra,* 162 Cal.App.2d at p. 155); the APA does not (Gov. Code, § 11346.8; *California Optometric Assn.* v. *Lackner, supra,* 60 Cal.App.3d at p. 507).

The APA and the CMA seem most discrepant in four areas—rationale, public notice, approval, and authorization for judicial review. By "rationale" we mean an agency's obligation under the APA to explain, preliminarily in the notice of proposed adoption and comprehensively in the agency's "final statement of reasons": (1) the necessity for the regulation; (2) why it was chosen instead of some alternate form of regulation which might be of lesser impact on the affected persons and businesses; and (3) why changes from the originally proposed text of the regulation were made or not made as the case may be in response to objections or comments received by the agency. (Gov. Code, §§ 11346.14, 11346.4, former § 11346.7, subd. (b).) On this score, the CMA only requires the secretary to send a notice of hearing and the proposed order to the affected parties, along with some detail about the commodity and the area affected by the order if issued, and then, after the public hearing, to make findings appropriate to the type of

order proposed to be issued, i.e., one which limits or does not limit quantity. (Food & Agr. Code, §§ 58773, 58787, 58994.) Thus, the CMA, unlike the APA, does not appear to compel the secretary to disclose the reasoning underlying the findings made or to explain why the particular order was selected over some other suggested version, if any.

With respect to "public notice," under the APA publication of both the notice of the proposed regulation and the regulation as approved in the appropriate regulatory journal arguably promotes wider dissemination of the notice and the regulation among those that have not received actual notice. Apparently, under the CMA, a person that is not an industry member can acquire the notice of hearing on a proposed marketing order and a copy of the proposed order only from a member that has received the documents, or perhaps from the secretary.[7] It is conjectural whether issued marketing orders enjoy wider circulation; Food and Agricultural Code section 59111 only requires that a "notice of the issuance" of a marketing order, and not the marketing order itself, be posted on the secretary's bulletin board and mailed to all affected persons and entities as well as to those that have requested such notice.

Moreover, the content of an APA notice may be somewhat more extensive than its CMA counterpart. To insure that those likely to be affected by a state regulation are adequately informed about the subject matter of the proposed regulation and its possible impact, the APA requires that the notice contain certain specific facts, such as the legal authority for the regulation and the likely cost impact of the regulation, including any significant adverse economic impact on small businesses. (Gov. Code, § 11346.5, former § 11346.53.) The CMA's requirement appears to be less extensive; the notice of hearing need only announce that the secretary will receive at the hearing evidence about the subjects for which the secretary is required to make findings as a precondition to the issuance of a marketing order. (Food & Agr. Code, § 58774.)

The "approval" process for regulations subject to the APA varies considerably from the approval process applicable to marketing orders under the CMA. The decision to issue an APA regulation after comments are received or the public hearing held rests with the sponsoring agency, subject to administrative review by the Office of Administrative Law, an independent

---

[7]Although section 58771 of the Food and Agricultural Code states that the secretary "shall . . . give notice of not less than 30 days for a public hearing upon a proposed marketing order," it does not direct that the notice be given to any identified person or entity. Section 58773 of the Food and Agricultural Code requires that notice "shall *also*" be mailed to every producer or handler that may be directly affected by the proposed order, but neither it nor any other provision in the CMA describes any other person or entity who should be notified.

agency "charged with the orderly review of adopted regulations" (Gov. Code, § 11340.1), and thereafter the Governor's Office. (Gov. Code, §§ 11349, 11349.1, 11349.5.) The Office of Administrative Law evaluates whether (1) the administrative record supports the need for the regulation; (2) the agency is authorized to adopt the particular regulation; (3) the regulation as written will be easily understood by those directly affected by it; (4) the regulation is in harmony with existing law; (5) the regulation is consistent with the law interpreted, implemented or made specific by the regulation; and (6) the regulation duplicates or overlaps existing state or federal law or regulation. (Gov. Code, §§ 11349, 11349.1, subd. (a).) The Office of Administrative Law must either "approve a regulation . . . and transmit it to the Secretary of State for filing or disapprove it within 30 working days after the regulation has been submitted to the [Office of Administrative Law] for review."[8] (Gov. Code, § 11349.3, subd. (a).) A disapproved regulation is returned to the agency with a statement of reasons for the disapproval. (Gov. Code, § 11349.3, subd. (b).) The agency may, under certain conditions, either rewrite and resubmit the regulation or re-adopt it in accord with the procedures applicable to the original adoption of the regulation. (Gov. Code, § 11349.4, subd. (a).) Alternatively, the agency may request that the Governor's office review the disapproval of the regulation; the Governor's office is authorized to reverse the decision of the Office of Administrative Law and submit the regulation to the Secretary of State for filing. (Gov. Code, § 11349.5.)

Approval of a marketing order after the public hearing is democratically decided by a vote, taken in the manner directed by the secretary, of the very persons to be affected by the order. If the secretary has selected what are referred to as "written assents," the CMA provides that a marketing order may not become effective unless the secretary finds, for example, that not less than 65 percent of the eligible affected producers that produce not less than 51 percent of the commodity covered by the proposed order, or 51 percent of the producers that produce not less than 65 percent of the volume of the commodity, assent in writing to the issuance of the proposed order. (Food & Agr. Code, § 58993.)[9] If the secretary has selected what is referred to as a referendum, the CMA provides that a marketing order may not become effective unless the secretary finds, for example, that ballots have

---

[8] If the Office of Administrative Law fails to act within the 30 days, the regulation is deemed to be approved and the office must transmit it to the Secretary of State for filing.

[9] The CMA sets out the standards for approval by written assent for producers and producer marketing (Food & Agr. Code, § 58993); processors (Food & Agr. Code, § 58992) and handlers (Food & Agr. Code, § 58991). The provisions pertaining to handlers found in Food and Agricultural Code section 58991, subdivisions (a) and (b), are typical; the requisite findings are that:

been cast by at least 40 percent of the total number of eligible affected producers and that at least 65 percent of the producers that voted and that deal with at least 51 percent of the total quantity of the commodity covered by the proposed order have voted in favor of the issuance of the proposed order. (Food & Agr. Code, § 58993, subd. (c).)[10]

Furthermore, the CMA provides for termination of an order by equally, and in some instances considerably more liberal, democratic means. The secretary may independently notice a hearing, under the procedures applicable to the initial issuance of an order, for the purpose of determining whether the order "is contrary to, or does not tend to effectuate, the declared purposes or provisions" of the CMA. (Food & Agr. Code, § 59081.) Alternatively, the secretary must "terminate any marketing order if [the secretary] finds that the termination of the marketing order is requested in writing, within a 90-day period, by at least 51 percent of the producers that are directly affected that produce at least 51 percent of the volume of the product, or by at least 51 percent of the handlers that are directly affected that handle at least 51 percent of the volume of the product." (Food & Agr. Code, § 59082.)

---

"(a) [The proposed order] has been assented to in writing by not less than 65 percent of the handlers that are engaged, within the area specified in the marketing order . . . in the handling of the commodity which is regulated by the marketing order.

"(b) [The proposed order] has been assented to in writing by handlers that handle not less than 65 percent of the volume of the commodity which is regulated by the marketing order." (Food & Agr. Code, § 58991, subds. (a) and (b).)

[10]The CMA sets out standards for approval by referendum for producers (Food & Agr. Code, § 58993), processors (Food & Agr. Code, § 58992), and handlers (Food & Agr. Code, § 58991). The provisions pertaining to handlers found in Food and Agricultural Code section 58991, subdivision (c), are typical; the conditions are:

"(c) [The proposed order] has been approved by handlers in a referendum among handlers that are directly affected. The director may make the finding pursuant to this subdivision if the valid votes cast in the referendum represent not less than 40 percent of the total number of handlers of the commodity of record with the department, and if the handlers that cast ballots in the referendum in favor of the marketing order or amendment to it represent not less than 65 percent of the total number of handlers that cast ballots in the referendum and handled not less than 51 percent of the total quantity of the commodity which was marketed in the next preceding marketing season, or the current marketing season if the harvest and delivery of the commodity to handlers is complete, by all of the handlers that cast ballots in the referendum, or if the handlers that cast ballots in the referendum in favor of the marketing order or amendment represent not less than 51 percent of the total number of handlers that cast ballots in the referendum and handled not less than 65 percent of the total quantity of the commodity which was handled in the next preceding marketing season, or the current marketing season if the harvest and delivery of the commodity to handlers is complete, by all of the handlers who cast ballots in the referendum. The quantity of the commodity handled by the handler may be stated on the referendum ballot returned by each handler or may be obtained by requiring handlers to report that volume pursuant to Section 58775." (Food & Agr. Code, § 58991, subd. (c).)

Additionally, the secretary must "hold a hearing on the question" whether an issued marketing order should be reapproved by the affected parties, and whether such reapproval shall be by written assent or referendum, if "at least 25 percent of the producers that are directly affected that produce at least 25 percent of the product and at least 25 percent of the handlers that are directly affected that handle at least 25 percent of the product request, within a 90-day period," such submittal for reapproval. (Food & Agr. Code, § 59083.) If the secretary "finds after the hearing that a substantial question exists as to whether [the] marketing order is contrary to, or does not effectuate the declared purposes or provisions of, [the CMA] within the standards and subject to the limitations and restrictions which are imposed in [the CMA], such marketing order shall be submitted for the reapproval of those producers and handlers that are directly affected . . . ." (Food & Agr. Code, § 59083.) If the marketing order is not reapproved, the secretary must declare it terminated; an order is reapproved if it "has been assented to or favored at a referendum in the same manner as is required for a new marketing order." (Food & Agr. Code, § 59084.)[11] The secretary must also hold a hearing "on the question of the termination, suspension, amendment, or reapproval of" the order if the secretary at any time finds "that a substantial number of persons that are directly affected by an order are in opposition to it . . . ." (Food & Agr. Code, § 59085.) In all events, the secretary must notice and hold a hearing on an existing order at least every five years; if upon the evidence presented at such hearing the secretary finds there exists a substantial question about whether the order continues to effectuate the purposes of the CMA, he or she must resubmit the order for reapproval by the affected industry members. (Food & Agr. Code, § 59086.)

With respect to "judicial review," the CMA has no provision comparable to Government Code section 11350, which authorizes "[a]ny interested person" to bring an action in superior court in order to "obtain a judicial declaration as to the validity of any regulation."

We are not persuaded the differences between the APA and the CMA in these four areas—rationale, public notice, approval, and authorization for judicial review—necessitate a conclusion that the CMA "fails to give sufficient public protection and participation . . ." in the issuance of a marketing order. (Sen. Interim Com. on Administrative Regulations, First Rep. *supra*, p. 64.) Promulgation of a regulation under the APA represents the unilateral imposition of a state agency's will upon the segment of the public to be

---

[11]A marketing order cannot be submitted for reapproval "until one year after the original enactment, or within one year of any prior approval." (Food & Agr. Code, § 59086.) No suspension or termination of a marketing order becomes effective "until the expiration of the marketing season then current." (Food & Agr. Code, § 59088.)

regulated. The APA therefore requires the agency to justify its initial decision to propose the regulation and its final decision to issue it in the face of the objections or criticisms of those to be regulated. It also makes provision for an independent review of the agency's authority and reasoning, as well as of the content and form of the regulation. (See Gov. Code, § 11349.1.)

By contrast, a marketing order is not unilaterally imposed upon the affected persons and entities. Issuance of a notice of hearing by the secretary does not manifest a decision that a marketing order will be adopted unless it is found to be unauthorized, unnecessary, unclear, inconsistent or the like. A marketing order will not become effective unless it is first approved by the stipulated percentage of those who will bear its burdens. (Food & Agr. Code, §§ 58991, 58992, 58993.)[12] It also enjoys no guaranteed life-span. (Food & Agr. Code, §§ 59082, 59083, 59085.) At minimum, an order is put at risk every five years. (Food & Agr. Code, § 59086.)

Further, because a marketing order must have the consent of the prescribed percentage of those to be regulated, it would serve no purpose to require the secretary to independently judge whether the order is "reasonably necessary," the standard applicable to a regulation adopted under the APA. Instead, the different standard set by the CMA—that is, whether the proposed order is "reasonably calculated" to attain the objectives, and "tend[s] to effectuate" the purposes, of the CMA (Food & Agr. Code, § 58813)— acknowledges the secretary's limited role of deciding whether the order, if favored by the electors, would carry out a legitimate goal of the CMA. Furthermore, the relevant legislative history confirms the Legislature did not intend the "reasonable necessity" standard to govern the secretary's decision under the CMA. As we pointed out above, when the Legislature amended the Food and Agricultural Code in 1957, it did not incorporate the sentence "[the secretary] may make such rules and regulations as are reasonably necessary" anywhere in the CMA, although it did insert the language in ten other provisions of the Food and Agricultural Code.

The pivotal role played by those to be regulated in the issuance of a marketing order also explains the CMA's requirement that the notice of

---

[12]In this connection, we disagree with respondents' assertion that the vote of the industry members is "merely a recommendation to be considered by the [s]ecretary along with the provisions, restrictions and limitations imposed by the Marketing Act." The affirmative vote of the requisite percentages of the eligible electorate is an absolute precondition to the secretary's authority to issue a marketing order. Each of the statutes which set the standards for the approval of a proposed order provide in substance that a marketing order *shall not* be made effective by the secretary unless and until the secretary finds that one or more of the specified conditions has been met. (See Food & Agr. Code, §§ 58991, 58992, 58993.) We leave open the question whether the secretary may refuse to issue a marketing order even though the secretary has made (or can make) the findings required to issue the order.

hearing on a proposed marketing order need only announce that the secretary will receive, at the hearing, evidence about the subjects for which the secretary is required to make findings as a precondition to the issuance of an order (Food & Agr. Code, § 58774). The inclusion of a copy of the proposed order with the notice of hearing gives each affected person detailed information about the contents of the proposed order and therefore adequate information to enable the person to make informed decisions about presenting evidence at the hearing and voting on what is ultimately submitted to the electors.

Likewise, the fact that the CMA does not provide for review of an approved marketing order by the Office of Administrative Law does not convince us that the CMA fails to appropriately protect the public. As we have said a number of times, a marketing order does not represent a decision by a state agency to saddle some segment of the public with another governmental ordinance. It is instead an industrywide, self-imposed economic regulation calculated to maintain, for what may prove to be only a limited period of time, a rational market for the particular commodity. A marketing order cannot have life unless it is approved by a high percentage of those upon which its burdens will fall. These affected industry members necessarily operate in, and therefore may be presumed to know the fundamentals and the idiosyncrasies of, the relevant market and the probable effect the order will have upon them and upon all aspects of that market. The Office of Administrative Law conducts semantic, grammatical, and legal assessments of adopted administrative regulations. It is unlikely to have intimate information and experience concerning the marketing of commodities covered by the CMA, at least not equivalent to that possessed by those who produce, handle or process such commodities. Under these circumstances, to conclude the CMA fails to adequately protect the public because it lacks a provision giving the Office of Administrative Law what amounts to a veto power (subject to review by the Governor's office) over the considered judgment of the members of the impacted agricultural industry is unwarranted. (See *Brock* v. *Superior Court, supra,* 109 Cal.App.2d at p. 605.)

■ Finally, although the CMA does not include a provision equivalent to Government Code section 11350, the issuance of a marketing order is not foreclosed from effective judicial review. Any person that desires to dispute the legality of a marketing order has recourse to the courts, within the bounds of the standards applicable to judicial review of such orders. (See *Brock* v. *Superior Court, supra,* 109 Cal.App.2d at pp. 603-606.) Traditional mandamus (Code Civ. Proc., § 1085) is available to challenge the quasi-legislative actions of the secretary in issuing a marketing order. *(Brock* v.

*Superior Court, supra,* 109 Cal.App.2d at p. 603; see also *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 567 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) Declaratory and injunctive relief is also proper. (See *Paramount Citrus Assn.* v. *Jacobsen, supra,* 162 Cal.App.2d at p. 149; *Brock* v. *Superior Court, supra,* 109 Cal.App.2d at p. 603.) In addition, the complaining party need not be an affected industry member in order to access the courts with respect to a marketing order. California law has long recognized a "public interest" exception to the principle that only persons that are beneficially interested may seek a writ of mandate. (*Green* v. *Obledo* (1981) 29 Cal.3d 126, 144 [172 Cal.Rptr. 206, 624 P.2d 256].) Thus, " ' "where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty," ' " the petitioner " ' "need not show that he has any legal or special interest in the result" ' " of the petition; it is sufficient that " ' "he is interested as a citizen in having the laws executed and the duty in question enforced." ' " (*Ibid.*)

In comparing the two acts, we have not forgotten that it is protection of the *public* and participation by the *public* in the process of adoption of a regulation which the Legislature intended to be the critical factors in determining whether a conflict exists between the APA and the CMA for purpose of the application of section 14 of the Food and Agricultural Code. (See Sen. Interim Com. on Administrative Regulations, First Rep., *supra,* p. 64.) However, the APA itself only requires express notification by mail to a "representative number" of those persons who will be directly impacted by a regulation if adopted. (Gov. Code, § 11346.4.) Further notice must be given only "when appropriate in the judgment of the . . . agency" to other persons or groups that might be interested in the regulation. (*Ibid.*) Even if a public hearing is to be held, the sponsoring agency need personally notify only "to the extent practicable" those that have specifically requested notice. (Gov. Code, § 11346.8.) While publication in the California Regulatory Notice Register (Gov. Code, § 11346.4) might be considered notice to the general public, we doubt most of the citizens of this state regularly consult this document.

We consequently do not believe the Legislature (or the subcommittee) had in mind the *public* at large, i.e., every resident of the State of California; instead we conclude the reference to the "public" was to that segment of the populace who would be directly impacted by the adoption of a proposed regulation.[13] On this score, the CMA is superior to the APA, for the CMA necessitates that actual notice by mail be delivered to all persons and entities

---

[13]For purposes of the conflict of the interest law (see Gov. Code, § 87103), the particular agricultural industry covered by a marketing order "is tantamount to, and constitutes, the public generally." (Food & Agr. Code, § 58852.)

likely to be directly affected by the issuance of a proposed marketing order. (Food & Agr. Code, § 58773.) As a practical matter, those members of the general public who wish to be heard in connection with the proposed adoption of a regulation under the APA or the proposed issuance of a marketing order under the CMA must take the initiative to ensure they learn of upcoming regulatory action. The fact that the California Regulatory Notice Register is not a source of information with respect to hearings on proposed marketing orders is not a reason in our estimation to insert any part of the APA into the CMA. It is not too much to ask one desirous of keeping abreast of pending proposals for marketing orders to contact the Department from time to time as appropriate.[14]

To summarize, a marketing order, unlike a regulation subject to the APA, is not a unilateral governmental intrusion into the private sector. The CMA is intended to assist, but not direct, the producers of agricultural commodities in this state in eliminating waste in marketing commodities, developing more efficient and equitable methods of marketing commodities, and improving and maintaining the purchasing power of such producers. (Food & Agr. Code, § 58652.) To do so, the CMA provides for substantive, effective participation in the process of issuance of a marketing order by all industry members—producers, distributors and processors—likely to be directly affected by the order. It also ensures disclosure to industry members of information relevant to both their decision to appear and present evidence at the hearing and their vote. The CMA requires the secretary to consider all relevant matter presented at such hearing, and preserves a record of the process for available judicial review. (See *California Optometric Assn.* v. *Lackner, supra,* 60 Cal.App.3d at pp. 505-506.) The CMA also goes well beyond the APA, for it conditions the issuance of an order not upon the approval of a state agency or official alone but instead upon the consent of a specified percentage of the members of the regulated industry that will be financially and operationally affected by the issuance of the order. Therefore, consistent with what we have found to be the legislative intent underlying section 14 of the Food and Agricultural Code, we conclude the issuance of a marketing order is expressly exempted by the statute from any of the requirements of the APA.

F. *Other Matters*

Because we have found the Legislature expressly intended to exempt the CMA from all influence of the APA, *Dew* v. *Appleberry* (1979) 23 Cal.3d

---

[14]Food and Agricultural Code section 59111 requires the secretary to mail notice of the issuance of an order to every person that files a request for such notice. The record seems to reflect, although it is not entirely clear, that the secretary as a matter of internal procedure does mail notices of hearings on proposed orders to such persons, even though the secretary is not compelled to do so by a provision of the CMA.

630, 636 [153 Cal.Rptr. 219, 591 P.2d 509], and *In re White* (1969) 1 Cal.3d 207, 212 [81 Cal.Rptr. 780, 460 P.2d 980], cases relied upon by Wileman which deal with the topic of implied rather than express statutory exemptions, are inapposite. The issues addressed by these opinions concerned whether one statute should be subordinated to another when the later did not manifest a legislative preference about which should prevail. In these circumstances, a repeal by implication is not favored. ■ The courts will not decree such a result unless "there is no rational basis for harmonizing the two potentially conflicting statutes" and the two statutes are " 'irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation.' " (*In re White, supra,* 1 Cal.3d at p. 212; see also *Hays* v. *Wood* (1979) 25 Cal.3d 772, 784 [160 Cal.Rptr. 102, 603 P.2d 19]; *Dew* v. *Appleberry, supra,* 23 Cal.3d at p. 636.) This high standard of conflict is set because it must be presumed the Legislature in enacting a law is " 'aware of existing, related laws and intended to maintain a consistent body of statutes.' " (*Hays* v. *Wood, supra,* 25 Cal.3d at p. 784; see also *American Federation of State etc. Employees* v. *County of San Diego* (1992) 11 Cal.App.4th 506, 514-515 [14 Cal.Rptr.2d 51].)

Here we do not face a situation where the Legislature has been silent about which set of competing statutes should prevail. (See *Engelmann* v. *State Bd. of Education, supra,* 2 Cal.App.4th at p. 59.) The Legislature has expressly articulated its desire to have the APA apply to rulemaking by the Department only "to the extent [the APA] is not specifically in conflict with the express terms of the provisions of" the Food and Agricultural Code. (Food & Agr. Code, § 14.) Our task, therefore, is not to determine whether there is any irreconcilable conflict between the provisions of the two schemes as if section 14 of the Food and Agricultural Code did not exist, but rather to implement this statute in accord with what we determine to be the meaning the Legislature intended its language to carry. (See *State Water Resources Control Bd.* v. *Office of Admin. Law* (1993) 12 Cal.App.4th 697, 704 [16 Cal.Rptr.2d 25].)

Likewise, *State Water Resources Control Bd.* v. *Office of Admin. Law, supra,* 12 Cal.App.4th 697, does not support the positions taken by Wileman. The requirement in the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.) that the regional water quality control boards formulate and adopt water quality control plans (see Wat. Code, § 13240 et seq.) was, with one exception (see Wat. Code, § 13244), unaccompanied by any procedures governing the implementation of this authority, and the Court of Appeal did not refer to any statute comparable to section 14 of the Food and Agricultural Code. Thus, under Government Code section 11346, the APA applied to a water agency's adoption of a regional water quality control plan,

which the appellate court found to be within the definition of a regulation under Government Code section 11342, former subdivision (b) (now subd. (g)).

Nor is there any help for Wileman in those federal cases, such as *Sequoia Orange Co.* v. *Yeutter* (9th Cir. 1992) 973 F.2d 752, 758, which have found the issuance of marketing orders under the federal Agricultural Marketing Agreement Act (7 U.S.C. § 601 et seq.) to be subject to many of the requirements of the federal Administrative Procedure Act (5 U.S.C. § 551 et seq.). We are concerned here solely with the interpretation and application of California statutes. Because the legislative history of section 14 of the Food and Agricultural Code points us to the proper construction of that statute, we have no need to consult federal authorities for guidance. (Cf. *Price* v. *Civil Service Com.* (1980) 26 Cal.3d 257, 270-277 [161 Cal.Rptr. 475, 604 P.2d 1365]; *City & County of San Francisco* v. *Fair Employment and Housing Com.* (1987) 191 Cal.App.3d 976, 985 [236 Cal.Rptr. 716].)

Wileman also claims certain provisions of the CMA reflect a legislative intention that the promulgation of a marketing order be subject to the APA. Both section 58938.5 and section 64308.5, subdivision (f), of the Food and Agricultural Code (parts of the CMA) expressly state that rulemaking by the secretary with respect to the refund of fees or assessments applicable to milk marketing orders "shall *not* be subject to" the APA. (Italics added.) According to Wileman, if ". . . the Legislature had not intended regulations issued under [the CMA] to comply with the [APA], the specific exclusions from compliance with the APA found" in these two sections of the CMA "would have been unnecessary surplusage."

We reach the opposite conclusion. Nowhere in the CMA, or anywhere else in the Food and Agricultural Code, is there any procedure which directs the manner in which the regulations identified in Food and Agricultural Code sections 58938.5 and 64308.5, subdivision (f), are to be adopted. Thus, in the absence of the express exclusions inserted in the sections, the secretary's implementation of these grants of rulemaking authority would be subject to the APA by virtue of the provisions of section 14 of the Food and Agricultural Code. Such a result is consonant with the legislative history we earlier reviewed; the subcommittee's report in part recommended integration of the "provisions of [the APA] into those statutes *which are silent* on procedures to be followed." (Sen. Interim Com. on Administrative Regulations, First Rep., *supra*, at p. 8, italics added.)

The same is true with respect to a number of other sections of the Food and Agricultural Code highlighted by Wileman.[15] In each of these statutes, the Legislature has explicitly said that the authorized rulemaking is *not* subject to the APA. Wileman takes the position these express exemptions from the APA "for specified rules and regulations regarding a few commodities" bespeaks a legislative intent that "all other regulatory actions (including the promulgation of marketing orders by the [secretary]) must comply with the APA." However, none of the grants of rulemaking authority identified by Wileman are a part of the CMA, and there are no procedures for the enactment of the permitted rules and regulations set out anywhere in the Food and Agricultural Code. Therefore, as with sections 58938.5 and 64308.5, subdivision (f) of the Food and Agricultural Code, section 14 of the Food and Agricultural Code would compel the secretary to comply with the APA to the extent the express exclusion from the APA did not exist in any one or more of these several statutes.

Wileman also argues that because Food and Agricultural Code section 42684 expressly requires the secretary to follow the APA when adopting regulations for minimum quality and maturity standards, the secretary must follow the APA in issuing a marketing order under the CMA if such an order includes, as the plum marketing order in issue here appears to include, quality and maturity standards. Section 42684 is not a part of the CMA. It is found instead in chapter 2, of division 17, entitled "Fruit, Nut, and Vegetable Standards." Subdivision (a) of Food and Agricultural Code section 42684 reads: "It is hereby declared that the establishment and maintenance of *minimum standards of quality and maturity* for fruits, nuts, and vegetables is essential to insure that products of acceptable and marketable quality will be available to the consumer." (Italics added.)

Subdivision (f) of Food and Agricultural Code section 42684 provides: "All regulations shall be adopted in accordance with Chapter 3.5 (commencing with § 11340) of Part 1 of Division 3 of Title 2 of the Government Code [the APA]. However, the director, prior to adopting any emergency regulations for quality and maturity standards for any fruits, nuts, and vegetables, shall hold a public hearing. Notice of the hearing shall be given to all persons known to the director to be interested in the proposed emergency regulations, not less than three days prior to such hearing. Any such public hearing on emergency regulations is not in place of, and shall not preclude

---

[15]The sections are: Food and Agricultural Code sections 6045.3 (Curly Top Virus Control Board), 13145 (Pesticide Contamination Prevention Act), 14660 (fertilizing materials), 14979 (Feed Inspection Advisory Board), 27561 (California-grown poultry), 41207.6 (grapes for wine and by-products), 41865.2 (Garlic and Onion Dehydrator Advisory Committee ), 42806 (Standardization Program), 44988 (Avocados), 58938.5 (Milk Marketing Orders), 64308.5 (Milk Marketing Orders), 77082 (Walnut Commission) and 77451 (Strawberry Commission).

the director from holding, a public hearing within 120 days after adoption of such emergency regulations to make the emergency regulations permanent."

Because neither section 42684 nor its companion statutes in chapter 2 of division 17 of the Food and Agricultural Code describe any procedures which must be followed to promulgate the subject minimum standards, section 14 of the Food and Agricultural Code would require the secretary to comply with the APA even in the absence of the explicit directive in the first sentence of section 42684, subdivision (f). Nevertheless, why the Legislature in 1977 chose to include this specific command in section 42684 (Stats. 1977, ch. 658, § 1, p. 2173) is of no importance to us. It is section 14 of the Food and Agricultural Code we are called upon to construe and apply with respect to the CMA. We know what the Legislature had in mind when it enacted that statute in 1957.

Furthermore, the CMA acknowledges that minimum grade standards may be established under other provisions of law such as Food and Agricultural Code section 42684. Although a marketing order issued under the CMA may contain terms regarding quality standards pertaining to the commodity (Food & Agr. Code, §§ 58883-58888), such quality standards may not be pegged below the minimum standards otherwise prescribed for the commodity (Food & Agr. Code, § 58888). Consequently, compliance with the APA is not necessary when a marketing order sets quality standards because: (1) any Food and Agricultural Code section 42684 minimum standard in effect contemporaneously with a CMA marketing order would have been adopted in accord with the APA; and (2) any standard exceeding such a minimum prescribed by the marketing order will have been adopted in accord with the CMA, which we have found to provide public participation and protection substantially equivalent to that offered by the APA.

Last, we have reviewed the Legislative Counsel's 1993 opinion that the secretary "is required to comply with [the APA] in issuing the California Plum Marketing [Order] to the extent [the APA] does not specifically conflict with the requirements" of the CMA. (Ops. Cal. Legis. Counsel, No. 32596 (Dec. 17, 1993) California Marketing Act of 1937: Issuance of Marketing Order, p. 2.) The opinion, in substance, is nothing more than a reiteration of the operative language of Food and Agricultural Code section 14. It was obviously not a part of the legislative history of either Government Code section 11346 or Food and Agricultural Code section 14. Although the opinion did not attempt to identify exactly which provisions of the CMA were in specific conflict with the APA, it did mention the general rule concerning implied exemptions, citing *In re White, supra,* 1 Cal.3d at page 212, as being the standard for determining the existence of a conflict, a

notion we have rejected. Moreover, the opinion neither apprehended the ambiguity in the express language of section 14 of the Food and Agricultural Code nor considered the legislative history of the statute. For these reasons, we find the opinion unpersuasive. (See *Grupe Development Co.* v. *Superior Court* (1993) 4 Cal.4th 911, 922 [16 Cal.Rptr.2d 226, 844 P.2d 545].)

### G.  *Conclusion*

Standing alone the APA is complicated; to throw it entirely into the CMA, or to require it to be incorporated into the CMA to the extent the two schemes are not irreconcilable, would create a labyrinth even Theseus might refuse to enter. The history of section 14 of the Food and Agricultural Code establishes that the Legislature did not want the Department to have to find its way through such a maze. The Department was therefore not required to comply with any part of the APA in issuing the plum marketing order.

It is unnecessary to discuss any other point raised by the parties. We make clear we have decided but one issue, the only one raised by Wileman's moving papers, about whether the APA applies to any extent to the issuance of a marketing order, and nothing else. In particular, we take no position about whether the plum marketing order as issued violates any federal law or violates, in content or in the manner in which it came to be issued, any provision of the CMA.[16]

### Disposition

The appeal by the Department is dismissed.

Let a writ of mandate issue from this court commanding the Superior Court for the County of Tulare to vacate its judgment as to the first, second, and fifth causes of action of the complaint and to vacate its order granting summary judgment in favor of respondents on each of these three causes of action.

Vartabedian, J., and Thaxter, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied September 25, 1996. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

[16]In its brief, Wileman maintains, among other similar claims, that the secretary "provided absolutely no findings of fact to support a conclusion that the proposed plum marketing program would tend to effectuate the declared purposes and policies of the [CMA]."