114 Cal.Rptr.2d 657 (2001)
94 Cal.App.4th 665
GERAWAN FARMING, INC., Plaintiff and Appellant,
v.
William LYONS, Jr., as Secretary, etc., Defendant and Respondent.
No. F031142.
Court of Appeal, Fifth District.
December 17, 2001.
Rehearing Denied January 8, 2002.
Review Granted March 20, 2002.
*658 Brian C. Leighton, Clovis; Mayer, Brown & Platt, Michael W. McConnell, Chicago, IL, and Sharon Swingle, Washington, Dist. of Columbia, for Plaintiff and Appellant.
King & Spaulding, Steven G. Brody, Jeanette M. Viggiano; Daniel J. Popeo, R. Shawn Gunnarson; Thomas, Walton & Graves and John R. Walton, for Washington Legal Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.
*659 Bill Lockyer, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Charles W. Getz IV and Richard M. Frank, Assistant Attorneys General, Edna Walz, Ronald A. Reiter, Seth E. Mermin and Tracy L. Winsor, Deputy Attorneys General, for Defendant and Respondent.
Kahn, Soares & Conway, George H. Soares, Dale A. Stern, Sacramento, and Robert S. Hedrick, for California Avocado Commission, California Apple Commission, California Asparagus Commission, California Cut Flower Commission, California Date Commission, California Egg Commission, California Forest Products Commission, California Grape Rootstock Improvement Commission, California Kiwifruit Commission, Lake County Winegrape Growers Commission, Lodi Woodbridge Winegrape Growers Commission, California Pepper Commission, California Pistachio Commission, California Rice Commission, California Sheep Commission, California Strawberry Commission, California Tomato Commission, California Walnut Commission, and California Wheat Commission as Amici Curiae on behalf of Defendant and Respondent.

OPINION
VARTABEDIAN, Acting P.J.

Introduction
In Gerawan Farming, Inc. v. Lyons (2000) 24 Cal.4th 468, 517, 101 Cal.Rptr.2d 470, 12 P.3d 720 (Gerawan), the Supreme Court assigned this court the responsibility to address "in the first instance" certain questions raised by the Gerawan court's conclusion that the California Plum Marketing Program (the Program) "implicates" plum growers' right to freedom of speech under California Constitution, article I, section 2, subdivision (a) (hereafter article I). The court designated these questions as "what protection, precisely, does article I afford commercial speech, at what level, of what kind, and .... subject to what test" and whether the Program violates that free speech right. (24 Cal.4th at p. 517, 101 Cal.Rptr.2d 470, 12 P.3d 720.)
This is, indeed, a heady assignment, if not placed fully within the context of the Gerawan opinion. However, we are certain the Supreme Court was fully cognizant of the importance of context in the judicial undertaking. As stated by Chief Justice, then Justice, George in his concurring opinion in Powers v. City of Richmond (1995) 10 Cal.4th 85, 116, 40 Cal. Rptr.2d 839, 893 P.2d 1160: "Well-settled principles of judicial restraint establish that when a case must be decided upon constitutional grounds, a court should strive to resolve the matter as narrowly as possible, and should avoid expansive constitutional pronouncements that inevitably prejudge future controversies and may have unforeseen and questionable consequences in other contexts." Gerawan itself is expressly limited to consideration of the Program as described by appellant in its complaint, that is, "[u]nder facts like those alleged herewe know not what facts may one day be proved...." (Gerawan, supra, 24 Cal.4th at p. 515, 101 Cal. Rptr.2d 470, 12 P.3d 720), even though the opinion also contains certain broad statements of policy in dicta. (See Golden Gateway Center v. Golden Gateway Tenants Assn. (2001) 26 Cal.4th 1013, 1029, 111 Cal.Rptr.2d 336, 29 P.3d 797.)
We will not attempt to canvas the entire field of commercial speech under article I, but instead will focus on the particulars of the Program as established by California statute. We determine the threshold test here is whether the operation of the generic advertising portion of the Program, determined by the California Supreme Court to implicate California constitutional free speech rights of dissenting growers, demonstrates *660 the exercise of a substantial governmental interest. We conclude the Program does not meet this test and thus violates appellant's right to freedom of speech under article I.

Facts and Procedural History
This case is before us, and was before the Supreme Court, on appeal from a judgment on the pleadings. The motion for judgment on the pleadings was filed by respondent, the Secretary of the California Department of Food and Agriculture, after appellant filed an amended complaint and before respondent answered that complaint. The motion was based "on the ground that Gerawan's amended complaint, like its original one, did not allege facts sufficient to constitute a cause of action." (Gerawan, supra, 24 Cal.4th at p. 482, 101 Cal.Rptr.2d 470, 12 P.3d 720; see id. at p. 515, fn. 13, 101 Cal.Rptr.2d 470,12 P.3d 720.) The trial court and this court held that the allegations of the amended complaint failed to "implicate Gerawan's right to freedom of speech under article I's free speech clause." (Id. at p. 483, 101 Cal.Rptr.2d 470, 12 P.3d 720.) The Supreme Court disagreed: "Gerawan's factual allegations are sufficient at least to implicate its article I right to freedom of speech against the California Plum Marketing Program for compelling funding of generic advertising." (Id. at p. 510, 101 Cal.Rptr.2d 470,12 P.3d 720.)
As summarized in the Gerawan opinion, the amended complaint alleged appellant "produces and handles plums; plums constitute a lawful product; it has developed, and uses, a brand for marketing purposes; it engages in commercial speech about its own branded plums through advertising; its message is not false or misleading; it is nevertheless compelled by the California Plum Marketing Program to fund commercial speech in the form of generic advertising about plums as a commodity against its will; and the compulsion of funding reduces the amount of money available for its own advertising." (Gerawan, supra, 24 Cal.4th at p. 510, 101 Cal.Rptr.2d 470, 12 P.3d 720.) As characterized in the amended complaint, the Program "is not so much a mechanism of regulation of the producers and handlers of an agricultural commodity by a governmental agency, as a mechanism of self-regulation by the producers and handlers themselves....." (Id. at p. 515, fn. 13, 101 Cal.Rptr.2d 470, 12 P.3d 720.) The advertising "is intended not to prevent or correct any otherwise false or misleading message in the interest of consumer protection, but solely to develop markets and promote sales in the interest of producer welfare." (Id. at p. 510, 101 Cal.Rptr.2d 470, 12 P.3d 720.) The Program was established pursuant to the California Marketing Act of 1937, as amended, Food and Agriculture Code section 58601 et seq. (All further section references are to the Food and Agriculture Code, except as otherwise indicated.)

DISCUSSION
Gerawan established a new framework for consideration of free speech issues in the commercial context. "We recognize that our conclusions concerning article I's free speech clause and commercial speech, which are set out in the text, have not been anticipated completely and in their entirety in prior California judicial decisions. That is because article I's free speech clause and commercial speech were not considered on their own terms in any of these prior decisions, but only, for example, through the distorting lens of the United States Supreme Court's commercial speech/noncommercial speech dichotomy in First Amendment jurisprudence." (Gerawan, supra, 24 Cal.4th at p. 497, fn. 6, 101 Cal.Rptr.2d 470,12 P.3d 720.)
*661 The full contours of this new framework have not been established.[1] In the particular context before us, namely, compelled funding of advertising, the court established the following parameters:
1. The free speech right is "put at risk both by prohibiting a speaker from funding speech that he otherwise would fund and also by compelling him to fund speech that he otherwise would not fund." (Gerawan, supra, 24 Cal.4th at p. 491, 101 Cal. Rptr.2d 470,12 P.3d 720.)
2. Article I's right to free speech "protects [commercial] speechsurely so in the form of truthful and nonmisleading messages about lawful products and services." (Gerawan, supra, 24 Cal.4th at p. 493, 101 Cal.Rptr.2d 470, 12 P.3d 720.)
3. "[A]rticle I's right to freedom of speech, without more, would not allow compelling one who engages in commercial speech to fund speech in the form of advertising that he would otherwise not," unless the funded speech is necessary to make the original speech not false or misleading. (Gerawan, supra, 24 Cal.4th at pp. 509-510, 101 Cal.Rptr.2d 470, 12 P.3d 720.)
4. As alleged in the operative pleading upon which judgment was granted, "the California Plum Marketing Program compels [appellant] to fund, against its will, commercial speech in the form of generic advertising about plums as a commodity-generic advertising that is intended not to prevent or correct any otherwise false or misleading message in the interest of consumer protection, but solely to develop markets and promote sales in the interest of producer welfare." (Gerawan, supra, 24 Cal.4th at p. 510, 101 Cal.Rptr.2d 470, 12 P.3d 720.) The "factual allegations are sufficient at least to implicate [appellant's] article I right to freedom of speech....." (Ibid.)
Initially, we must note that the approach taken by respondent in his briefs on remand to this court fails to appreciate the reimaging of the free speech right accomplished in Gerawan. For example, respondent asserts: "The link between the payment of a general assessment to the Secretary and the viewpoint of any particular payor is so attenuated that the payment of the assessment neither signifies .... support of the program nor impinges on any constitutionally protected right of expression." The conflict between this assertion and the material quoted in paragraph 4, above, is rather stark.
Another example: Respondent seeks to distinguish expression of "sentiments" protected by article I from the kinds of views at issue in this case: "It is difficult to imagine that the sphere of commercial speech is populated much, if at all, by constitutionally protected sentiments." This assertion seems wholly to ignore the express holding of Gerawan, quoted in paragraph 2, above, which could hardly be more directly to the contrary. While we have fully considered the views expressed by respondent, we will not discuss the merits of those views where the result of such discussion clearly is preordained by Gerawan. (See Auto Equity Sales, Inc. v. *662 Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.)
We now turn to the matters left open for our consideration upon remand. (See Gerawan, supra, 24 Cal.4th at p. 517, 101 Cal.Rptr.2d 470, 12 P.3d 720.) As we explain below, we have determined that a statutory marketing program that permits some plum growers to mandate that all plum growers participate financially in the program does not embody a substantial governmental interest sufficient to outweigh the free speech rights of plum producers. In the absence of a substantial governmental interest sufficient to outweigh those free speech rights, we must conclude a program that implicates the free speech rights also violates those rights.
Resolution of the case before us does not require that we attempt to formulate a broad test for determining, in all contexts, whether governmental action violates article I commercial free speech rights. In particular, we do not determine what test might be applicable to a compulsory, collective advertising program that arose from legislative or administrative imposition of such a program. Given the widely appreciated significance of agriculture in the economy of California, it may well be that a redesigned program could reflect a sufficiently strong governmental interest to justify infringement on individual growers' free speech rights, whether that justification were measured by the traditional "rational basis" test (see Daggett v. Colgan (1891) 92 Cal. 53, 57, 28 P. 51), a more stringent First Amendment test (see, e.g., Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n (1980) 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341; Smith v. Regents of University of California (1993) 4 Cal.4th 843, 854, 16 Cal.Rptr.2d 181, 844 P.2d 500), or by an "abuse of the right" test appellant claims to find in the text of article I itself. Aware that we are both working within and adding substance to the commercial speech framework established by Gerawan, we confine ourselves to the questions presented by the marketing program as presently constituted. Those questions result in only one possible answer: the present plum marketing program violates the free speech rights of dissenting plum producers.

A. Is Commercial Speech Different?
We begin by agreeing with appellant that Gerawan held ("It is not otherwise with respect to .... commercial speech" (Gerawan, supra, 24 Cal.4th at p. 493, 101 Cal.Rptr.2d 470, 12 P.3d 720)) there is no difference under article I between, on the one hand, political and ideological speech and, on the other, commercial speech, "at least in the form of truthful and nonmisleading messages about lawful products and services." (Gerawan, supra, 24 Cal.4th at pp. 493-494, 101 Cal.Rptr.2d 470, 12 P.3d 720.) All such speech may simply be designated "protected speech" (cf. id. at p. 469, 101 Cal.Rptr.2d 470, 12 P.3d 720) and all such speech may equally render the speaker "responsible for the abuse of this right" of free speech. (Cal. Const., art. I, § 2, subd. (a).)
In the absence of countervailing societal interests ("without more," as Gerawan puts it (24 Cal.4th at p. 509, 101 Cal.Rptr.2d 470, 12 P.3d 720)), commercial, political, ideological, artistic, and other forms of speech are all protected by article I's right to "speak, write and publish his or her sentiments on all subjects....." (Gerawan, supra, 24 Cal.4th at p. 493, 101 Cal.Rptr.2d 470, 12 P.3d 720.) The issue after Gerawan is not whether commercial speech is protectedor even whether it is protected differentlybut, instead, as we see it, whether particular restrictions on speechcommercial or otherwiseare justified by particular societal interests.

*663 B. The Variable Nature of Justification for Regulating Speech

Regulation of various forms of speech may be justified by society's needs under varying circumstances. Shouting "fire" clearly is an instance of protected speechthat is, no one would propose the word itself could be outlawedyet punishment for "falsely shouting fire in a theatre and causing a panic" (Schenck v. United States (1919) 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470) is a paradigmatic example of speech regulation permitted by the federal and state Constitutions. (See Prisoners Union v. Department of Corrections (1982) 135 Cal.App.3d 930, 934, 185 Cal.Rptr. 634.)
The evaluation of societal justifications has taken on a formulaic aura in various settings. In other words, while courts recognize a particularized balance must be struck between the interest in free speech and society's justification for regulation of that speech, that determination usually is not made on an ad hoc basis but instead on the basis of what "type" of speech is involved. As a result of this formulaic approach, which we will describe more fully momentarily, courts sometimes refer to speech as "more" or "less" protected. (See, e.g., Leoni v. State Bar (1985) 39 Cal.3d 609, 622, fn. 11, 217 Cal.Rptr. 423, 704 P.2d 183; Belli v. State Bar (1974) 10 Cal.3d 824, 840, 112 Cal.Rptr. 527, 519 P.2d 575; Planning & Conservation League, Inc. v. Lungren (1995) 38 Cal. App.4th 497, 505, 45 Cal.Rptr.2d 183.)
By contrast, it appears to us (particularly with respect to article I freedom of speech as conceived in Gerawan (cf. Hill v. National Collegiate Athletic Assn. (1994) 7 Cal.4th 1, 62, 26 Cal.Rptr.2d 834, 865 P.2d 633 (cone. & dis. opinion of George, J.) [summarizing balancing test for California Constitution's right of privacy])) that a more productive way of looking at the matter is that speech "without more" is presumptively protected, and it is the societal justification that is "more" or "less" compelling in a particular instance. When courts speak of particular kinds of speech as "more protected" or "less protected," this is a report of the results of balancing and not the starting place for such balancing. We believe a more useful approach begins with an express identification of the societal justification for repressing speech in particular circumstances; the societal significance of the particular justification will then result in greater or lesser judicial scrutiny of the effort to regulate, ban, or punish that speech.
Viewing the freedom of speech issue in this manner, it becomes unnecessary for a court to embark on the virtually impossible task of defining "commercial speech." (See Rubin v. Coors Brewing Co. (1995) 514 U.S. 476, 493-494, 115 S.Ct. 1585 (opn. of Stevens, J., cone, in judg.); see also Spiritual Psychic Science Church v. City of Azusa (1985) 39 Cal.3d 501, 511, 217 Cal.Rptr. 225, 703 P.2d 1119; Kozinski & Banner, Who's Afraid of Commercial Speech? (1990) 76 Va. L.Rev. 627, 638-650.) Similarly, when we view the freedom of speech issue in this manner, it becomes unnecessary to attempt to formulate a generally applicable test for determining when the government may abridge commercial speech, however defined. Instead, we look at the particular justifications asserted for the restrictions on speech now before us; we consider whether the asserted governmental interests are sufficiently substantial to outweigh the free speech rights of dissenting plum growers.
We highlight a few common assertions of societal justification for regulating, prohibiting, or punishing speech in order to make clear the kind of analysis we propose to undertake of the advertising-speech at issue here.
*664 In the area of defamation law, an innocently made falsehood about a person is protected by article I. There is no sufficient societal interest in protecting either public or private persons from damage to reputation when the speaker has exercised due care in making the false statement. (See Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 746, 749, 257 Cal. Rptr. 708, 771 P.2d 406.)
If the same statement is negligently made about a private person, however, the societal justification for punishment of speech (at least in the form of actual damages) is great enough to outweigh the speaker's interest in free speech. (Brown v. Kelly Broadcasting Co., supra, 48 Cal.3d at pp. 744, 746, 257 Cal.Rptr. 708, 771 P.2d 406.) "A reasonable degree of protection for a private individual's reputation is essential to our system of ordered liberty." (Id. at p. 743, 257 Cal.Rptr. 708, 771 P.2d 406, quoted in Khawar v. Globe Internal, Inc. (1998) 19 Cal.4th 254, 272-273, 79 Cal.Rptr.2d 178, 965 P.2d 696.)
If the same false statement is made about a "public" person, the societal interest in protecting the defamed individual is reduced. A "public figure" by choice has placed himself or herself in the "public eye"; such a person is also more able to command media attention to counteract falsehoods published about him or her. (Brown v. Kelly Broadcasting, Inc., supra, 48 Cal.3d at p. 744, 257 Cal.Rptr. 708, 771 P.2d 406.) As a result of the weakened societal justification for protecting the reputation of a "public figure," the free speech rights of the speaker prevail unless the public figure can prove the speaker acted with "malice," that is, uttered the falsehood when the speaker knew it was false or recklessly disregarded whether it was true or false. (See Khawar v. Globe Internal., Inc., supra, 19 Cal.4th at pp. 274-275, 79 Cal.Rptr.2d 178, 965 P.2d 696 [applying First Amendment standard and reserving issue of standard under state law].)
In the context of protected "core" speech-political and ideological speech-the conventional "test" holds that speech may be regulated by the government if the regulation is (i) narrowly tailored, (ii) serves a significant government interest, and (iii) leaves open ample alternative avenues of communication. (Los Angeles Alliance for Survival v. City of Los Angeles (2000) 22 Cal.4th 352, 364, 93 Cal.Rptr.2d 1, 993 P.2d 334.) This form of review is called intermediate scrutiny or "time, place, and manner" analysis; it is applied, in these terms, to "content neutral" regulation of protected speech. (Ibid.)
When government attempts to regulate speech based on the content of the speech, the societal justification must be great indeed. Such restrictions are presumptively invalid. "To pass muster under the First Amendment, a content-based speech restriction must serve a compelling governmental interest and must be narrowly tailored to advance that interest while infringing on as little speech as possible." (Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at p. 385, 93 Cal.Rptr.2d 1, 993 P.2d 334 (dis. opn. of Kennard, J.).) This is sometimes known as the "strict" scrutiny balancing test. (See id. at p. 386, fn. 2, 93 Cal. Rptr.2d 1, 993 P.2d 334.) (The California Supreme Court has not yet decided whether the strict scrutiny test is the applicable article I test for review of content-based laws. (Id. at p. 386, 93 Cal.Rptr.2d 1, 993 P.2d 334.))
Nevertheless, underlying all of these specific tests we perceive a more generalized balancing test in which protected speech retains the same weight on one side of the balance but the societal justification for restricting speech is assigned a varying weight as part of the judicial review process. *665 (See also Trader Joe's Co. v. Progressive Campaigns, Inc. (1999) 73 Cal. App.4th 425, 427, 86 Cal.Rptr.2d 442; Union of Needletrades, etc. Employees v. Superior Court (1997) 56 Cal.App.4th 996, 1010, fn. 4, 65 Cal.Rptr.2d 838 [contrasting property owner's lesser interest in restricting speakers' attempt to organize property owner's on-site employees with property owner's greater interest in restricting speakers' attempt to encourage consumer boycott of goods made off-site in sweatshop conditions].)
We now turn to an effort to identify the societal or governmental interests against which the dissenting growers' free speech rights must be balanced.

C. The "Least Restrictive Means of Regulation" as a Governmental Interest.
One might argue that the state has a substantial interest in adoption of a marketing initiative as the least restrictive means of fostering the growth of this particular segment of the economy, eschewing the harsh "command and control" mechanisms of price and output control authorized by the statute. (See U.S. v. United Foods, Inc. (2001) 533 U.S. 405, 422, 121 S.Ct. 2334, 2344, 150 L.Ed.2d 438 (dis. opn. of Breyer, J.).) But this rationale assumes a substantial, valid governmental interest in the underlying regulatory program. The governmental interest in the present form of program is tenuous and is based on findings of necessity that are wholly illusory, for a simple reason: under the current statute, the government is forbidden to enact a remedial program no matter how severe an economic crisis arises in the plum industry unless a majority of growers wants the program.
Under the California Marketing Act, the Secretary of Food and Agriculture "shall" hold a hearing to determine the necessity for and terms of a marketing order if he "has reason to believe that the issuance of a marketing order .... will tend to effectuate the declared policy of this chapter. ...."(§ 58771.) However, even after the secretary makes findings of necessity for a marketing order (§ 58811), the growers are still empowered to reject that finding by voting against a proposed regulatory program. (§ 58993.) In the absence of an affirmative vote adopting a program, the secretary has no power to implement the program, regardless how overwhelming the state's interest in addressing current conditions: "If the director .... [cannot] make the finding that producers that are directly affected have approved the marketing order ...., he shall not make the marketing order .... effective." (§ 58997, emphasis added.)
Under these circumstances, it matters not that the government might have a substantial interest in instituting a regulatory program that retains the greatest range of freedom for growers, rejecting price and production controls in favor of advertising: in the absence of an affirmative and binding legislative or administrative determination that intervention in the market processes in the first instance is necessary, there is no legitimate basis for interference with the free speech rights of dissenting growers.

D. Preservation of Agriculture as a Governmental Interest.
One might argue that the State of California has a substantial, or even compelling, interest in preservation of the agricultural economy of the state, and that this justifies extensive promotion and regulation of that sector of the economy. (See §§ 58651, 58652 [legislative findings, declaration of policy]; see, e.g., Gov.Code, § 15372.61 [findings and declarations for California Tourism Marketing Act].) State government has long recognized the critically *666 important role of agriculture in local economies and in the economy of California. State government has long recognized, in various contexts, the need for governmental promotion of goods and services generated in California.
For example, the Legislature permits county governments to adopt programs promoting the products and potential of local economies. (See Gov.Code, §§ 26100, 26101.) But in the case of such local programs, in contrast to the industry-governed program before us, an elected public body makes the actual determination to impose taxes and to spend money to engage in the marketing and promotional activity. While it might be said that imposition of a room tax to fund the marketing activity pursuant to Revenue and Taxation Code section 7280 (see Gov.Code, § 26100, subd. (b)) targets "a discrete group of citizens [ ] to pay special subsidies for speech on the side" government favors (see U.S. v. United Foods, Inc., supra, 533 U.S. at p. 411, 121 S.Ct. at p. 2338), that tax is imposed by local officials responsible to the voters at large, not by means of a vote of a small segment of the interested public.
The same cannot be said in the case of programs under the California Marketing Act. As noted above, all government intervention for preservation of the agricultural industry can be vetoed by the producers' vote to reject a regulatory program. (See §§ 58991-58993, 58997.) Conversely, an assessment can be imposed on dissenting members of the industry by a bare majority of regulated persons, so long as that majority grows at least 65 percent of California plums. (§ 58993, subd. (b).) A public or governmental interest that can be entirely defeated by the very persons sought to be regulated, is tenuous indeed. Thus, whatever may be saidand there is muchconcerning the importance of agriculture to the state's economy, and however wide the range of governmental action permissible to preserve and promote that segment of the economy, there is no substantial governmental interest in restricting the free speech rights of agricultural producers in the haphazard manner permitted by the California Marketing Act.

E. The Governmental Interest in Speaking to Matters of Public Importance.
One might argue that the government has the right to engage in advertising and other speech to promote economic development and (in the case of agricultural products) healthy diets among the citizenry. The Legislature has expressly invoked this doctrine in the California Tourism Marketing Act: the act "creates a mechanism to fund generic promotions .... that bear[ ] the characteristics of, and [are] entitled to all the privileges and protections of, government speech." (Gov.Code, § 15372.61, subd. (d)(7).) It is fair to conclude it impliedly has invoked the doctrine in the California Marketing Act. One might further argue the government has a substantial interest in adequately funding such programs to ensure their effectiveness and has wide latitude in selecting a funding mechanism for any given program. (See Daggett v. Colgan, supra, 92 Cal. at p. 57, 28 P. 51.)
However, when the selected funding mechanism results in "a particular citizen, or a discrete group of citizens, [being compelled] to pay special subsidies for speech on the side [government] favors" (U.S. v. United Foods, Inc., supra, 533 U.S. at p. 411, 121 S.Ct. at p. 2338), the government is not free to adopt that particular mechanism without an independent justification for the funding mechanism ("without more," as Gerawan phrases the matter); justification for the underlying program alone is insufficient. (U.S. v. United Foods, Inc., supra, 533 U.S. at p. *667 413, 121 S.Ct. at p. 2339.) Whatever might be said about "governmental speech" funded from generalized tax revenues, when the funding mechanism targets a particular and narrow group, the act of funding the speech, in and of itself, takes on attributes of compelled speech (Gerawan Farming, Inc. v. Lyons, supra, 24 Cal.4th at p. 513, 101 Cal.Rptr.2d 470, 12 P.3d 720); such compulsion, as coerced speech, requires its own justification. No such justification has been offered.

F. The Issue of Voluntariness
We have stated above that the absence of a legislatively or administratively imposed marketing programthat is, the ability of a majority of growers to veto any proposed program or to force a program upon an unwilling minoritysignificantly undermines any governmental interest that otherwise might be asserted in opposition to dissenting growers' free speech rights. For convenience, we will refer to this as the voluntariness issue. At oral argument, counsel for the Secretary contended that it is impossible to reconcile a concern for the voluntariness issue with the federal free speech cases arising in the labor union context, seminally, Abood v. Detroit Board of Education, supra, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261. Labor unions, counsel pointed out, obtain collective bargaining rights in a given workplace only by vote of a majority of the workers, yet they are entitled under the First Amendment to impinge on the free speech rights of dissenting members of the minority so long as the impingement is germane to the collective bargaining process. (See Glickman v. Wileman Brothers & Elliott, Inc. (1997) 521 U.S. 457, 472-473, 117 S.Ct. 2130, 138 L.Ed.2d 585.) Counsel contended the same considerations make it inappropriate to focus on voluntariness as undermining the present programs.
We disagree. We are cautioned by Gerawan that the First Amendment can be a "distorting lens" through which to view the rights secured by article I. (See Gerawan Farming, Inc. v. Lyons, supra, 24 Cal.4th at p. 497, fn. 6, 101 Cal.Rptr.2d 470, 12 P.3d 720.) That lens is particularly distorting when the issue involves federal labor policy, an issue in which the federal government has long asserted strong and (virtually) exclusive control. It simply is not open to this court to weigh the governmental interest in the chosen structure for resolution of labor disputes-voluntary formation of labor unionsagainst the resulting impingement on the article I free speech rights of dissenting California workers.
More important, it is readily apparent that the governmental interest in a voluntary program in the field of labor relations is far different from the governmental interest asserted in the field of voluntarily established marketing orders. In the case of labor relations, the very existence of a regulated structure in which workers can assert their demands and grievances seeks, in and of itself, to preserve a measure of labor peace. The right to act collectivelyto seek to organizein itself serves to protect workers from oppressive, disruptive employer actions. Regulation of the right to act collectively, in turn, protects employers from violence and overreaching by workers. (See 1 Hardin, The Developing Labor Law (3d ed.1992) p. 17, 28.) That a collective bargaining unit sometimes results from concerted employee action is, of course, important; equally important, however, is the existence of a structured environment in which employees can attempt to reach that goal if they desire to do so.
By contrast, there is no claim that the structure for petition and referendum on marketing orders serves any societal interest *668 beyond the mere facilitation of decision making. The only aspect in which the government even asserts an interest is the final product, the approved marketing order. Far from asserting a public interest in the statutory structure for obtaining a marketing order, the Act provides that applicants for a marketing order may be required to privately fund the "expenses of preparing and making effective such marketing order" by depositing funds with the Secretary. (§ 58961.) Only if the marketing order is approved by referendum and implemented by the Secretary is the latter permitted to reimburse the applicant for those expenses. This funding mechanism adopted by the Legislature reflects a judgment that, until a marketing order is adopted, the process of adoption primarily serves private interests.
Thus, we conclude there is no analogy between restriction on dissenters' First Amendment rights by voluntarily formed collective bargaining units and restriction on dissenters' article I rights under voluntarily adopted marketing orders.

CONCLUSION
The right of free speech is fundamental to our constitutional system of government. (See, e.g., Los Angeles Alliance for Survival v. City of Los Angeles (2000) 22 Cal.4th 352, 383, 93 Cal.Rptr.2d 1, 993 P.2d 334 (dis. opn. of Kennard, J.).) That right, in the present circumstances, outweighs the asserted governmental interests in the Program before us, as statutorily constituted; the generic advertising portion of the Program violates the free speech rights of objecting plum growers and handlers as a matter of law. Appellant is entitled to withhold the portion of its California Plum Marketing Board assessment allocated to advertising and other speech-related functions of the California Plum Marketing Board, including lobbying and promotional contacts with produce retailers and wholesalers.

DISPOSITION
The judgment is reversed. The matter is remanded to the trial court for trial and determination of the amount of assessments allocated to speech functions of the California Plum Marketing Board. Appellant is entitled to an injunction prohibiting enforcement of assessments against objecting growers and handlers to the extent those assessments are for speech-related purposes as described above. Appellant is entitled to its costs on appeal.
I CONCUR: HARRIS, J.
LEVY, J.
I respectfully dissent.
The California Supreme Court instructed this court to address, in the first instance, various questions engendered by the confluence of the right to freedom of speech under California Constitution, article I, section 2, subdivision (a) (article I) and the California Plum Marketing Program. The court phrased this legal quandary as follows:
"Our conclusion, however, brings no conclusion to this cause. That the California Plum Marketing Program implicates Gerawan's right to freedom of speech under article I does not mean that it violates such right. But it does indeed raise the question. That question, in turn, raises others, including what test is appropriate for use in determining a violation. And that question, in its turn, raises still others as well, including what protection, precisely, does article I afford commercial speech, at what level, of what kind, and, perhaps `most difficult,' subject to what test." (Gerawan Farming, Inc. v. Lyons (2000) 24 Cal.4th 468, 517, 101 Cal.Rptr.2d 470, 12 P.3d 720.)
I write separately in an effort to respond to the Supreme Court's directive to formulate *669 a test applicable to compelled funding of generic advertising in the context of this mandated cooperative association.
The appropriate level of scrutiny for the review of a regulation that restricts or compels speech is dependent on the nature of that regulation and the context in which it is applied. For example, under the First Amendment, a content-based regulation that affects speech, other than commercial speech, is subject to the most exacting scrutiny. To pass constitutional muster, the government must show that the regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end. (Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd. (1991) 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476.) However, if the regulation at issue is unrelated to the content of the speech, it qualifies for intermediate scrutiny review. Such a regulation will be upheld if it furthers an important or substantial government interest that would be achieved less effectively absent the regulation. (Turner Broadcasting System, Inc. v. FCC (1994) 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497.) This intermediate test is also applied to First Amendment review of commercial speech. (Central Hudson Gas & Elec. v. Public Serv. Comm'n. (1980) 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341.) Finally, the context in which the subject speech is compelled may impact the analysis. As discussed in further detail below, where there is a sufficient reason to require persons to associate with one another, those compelled to cooperate in this manner may also be compelled to fund speech that is "germane" to the purposes of the association. (U.S. v. United Foods, Inc. (2001) 533 U.S. 405, 121 S.Ct. 2334, 2340, 150 L.Ed.2d 438.)
Here, the analysis must begin with the parameters set forth by our Supreme Court in Gerawan. As with the First Amendment, article I's right to freedom of speech may be implicated by the use of money. (Gerawan Farming, Inc. v. Lyons, supra, 24 Cal.4th at p. 491, 101 Cal.Rptr.2d 470, 12 P.3d 720.) Further, the First Amendment and article I both protect commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services. (24 Cal.4th at pp. 493, 498-499, 101 Cal. Rptr.2d 470, 12 P.3d 720.) However, unlike the First Amendment in this context, "article I's right to freedom of speech, without more, would not allow compelling one who engages in commercial speech to fund speech in the form of advertising that he would otherwise not, when his message is about a lawful product or service and is not otherwise false or misleading." (24 Cal.4th at pp. 509-510, 101 Cal.Rptr.2d 470, 12 P.3d 720.) Consequently, compelled funding of generic advertising under the California Plum Marketing Program implicates article I's free speech clause.
The context in which this compelled funding arises is also critical to the analysis. The California Plum Marketing Program, a marketing order issued under the California Marketing Act (CMA), requires the speech subsidy as part of a broader collective enterprise. This program establishes and authorizes the California Plum Marketing Board to: pursue research; conduct advertising; implement sales promotion and market development programs; and institute grade and quality standards and inspections. (Gerawan Farming, Inc. v. Lyons, supra, 24 Cal.4th at p. 508, 101 Cal.Rptr.2d 470, 12 P.3d 720; Voss v. Superior Court (1996) 46 Cal.App.4th 900, 905, 54 Cal.Rptr.2d 225.) This detailed regulatory scheme displaces "`many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws.'" (Gerawan Farming, Inc. v. Lyons, supra, 24 Cal.4th at p. 507, 101 Cal.Rptr.2d 470, 12 P.3d 720, citing *670 Glickman v. Wileman Brothers & Elliott, Inc. (1997) 521 U.S. 457, 469, 117 S.Ct. 2130, 138 L.Ed.2d 585.)
The CMA was patterned after, and enacted within days of, the federal Agricultural Marketing Agreement Act of 1937 (AMAA). (Gerawan Farming, Inc. v. Lyons, supra, 24 Cal.4th at p. 478, 101 Cal.Rptr.2d 470, 12 P.3d 720.) One purpose behind both Acts was to establish and maintain orderly marketing conditions and fair prices for agricultural commodities. (Ibid.)
It is beyond dispute that the CMA is critical to the California economy with respect to the future continued production of adequate supplies of food, fiber and other farm products. (Voss v. Superior Court, supra, 46 Cal.App.4th at pp. 907-908, 54 Cal.Rptr.2d 225.) Before the CMA was promulgated, California agriculture was chaotic. (Id. at p. 907, 54 Cal.Rptr.2d 225.) Each fruit or vegetable grower attempted to be the first in the market with his or her commodity in order to take advantage of the premium prices paid for early shipments. (Ibid.) This led to the marketing of inadequately ripened produce and the glutting of the market during the peak season with poor quality commodities. (Ibid.) In an attempt to enhance the attractiveness of the produce, growers would often resort to deceptive packaging, improper sampling, and false grading. (Ibid.) Consequently, consumer acceptance of California fruits and vegetables was adversely affected and California's agricultural wealth was unreasonably and unnecessarily wasted. (Ibid.)
Thus, it must be concluded that the state-mandated association of plum producers through the California Plum Marketing Program is justified. Ensuring a stable and consistent plum market constitutes a sufficiently compelling reason to require cooperation among growers. In light of the existence of a legitimate basis for the compelled association, the next step is to determine how this association impacts the concomitant speech.
Analogous situations have arisen in the context of unions and state bar associations. For example, a state may compel nonunion employees who benefit from the union's collective bargaining efforts to pay service fees to the union. (Abood v. Detroit Board of Education (1977) 431 U.S. 209, 217-223, 97 S.Ct. 1782, 52 L.Ed.2d 261.) This compelled association is justified by the state's interest in facilitating collective bargaining and preventing "`free riders.'" (Id. at pp. 220-222, 97 S.Ct. 1782.) Nevertheless, there are limits on a union's use of the mandatory fee. The nonmembers may prevent the union from using their contributions to fund the expression of political and ideological views unrelated to collective bargaining. (Id. at p. 234, 97 S.Ct. 1782.)
Similarly, a state's interest in regulating the legal profession and improving the quality of legal services justifies compulsory bar membership. (Keller v. State Bar of California (1990) 496 U.S. 1, 13-14, 110 S.Ct. 2228, 110 L.Ed.2d 1.) Therefore, the state bar association may "constitutionally fund activities germane to those goals out of the mandatory dues of all members." (Id. at p. 14, 110 S.Ct. 2228.) However, the bar association may not fund its own political expression in this manner. (Ibid.)
In sum, the state may require a person to support an organization if there is a sufficiently compelling reason to do so. However, the organization's use of mandatory contributions must be "germane" to the purposes justifying the support.
As noted above, the compelled association under the Plum Marketing Program is justified by the state's interest in maintaining orderly marketing conditions and fair prices for agricultural commodities. In light of the significant role California agriculture *671 plays with respect to both the economy and the food supply, it must be concluded that this interest is comparable in scope and importance to either facilitating collective bargaining or regulating the legal profession. In other words, as with the situations presented in Abood and Keller, there is an overriding associational purpose already requiring a contribution of money that may also allow a compelled subsidy for speech that is in furtherance of the program. (Cf. U.S. v. United Foods, Inc., supra, 533 U.S. at p. 413, 121 S.Ct. at p. 2340.) Consequently, the guidelines set forth in Abood and Keller should be used to determine what expenditures are permissible under article I's free speech clause.
The next task is to refine the Abood/Keller test. Although generally referred to as the "germaneness" test, it encompasses more than a determination of whether the speech is relevant to the goals of the association. Rather, when a member of a compelled association objects to being burdened with particular expenditures "the guiding standard must be whether the challenged expenditures are necessarily or reasonably incurred" for the purpose of furthering those goals. (Keller v. State Bar of California, supra, 496 U.S. at p. 14, 110 S.Ct. 2228.) Requiring more than a rational relationship and less than a narrowly tailored service of a compelling state interest, this test essentially constitutes an intermediate level of scrutiny. Moreover, this analysis is not specific to a particular type of speech. Compelled contributions to commercial speech, as well as political or ideological speech, are subject to this test. (U.S. v. United Foods, Inc., supra, 533 U.S. at p. 413, 121 S.Ct. at p. 2339.)
As stated above, the California Supreme Court opined that compelled generic advertising would not be allowed under article I "without more." (Gerawan Farming, Inc. v. Lyons, supra, 24 Cal.4th at pp. 509-510, 101 Cal.Rptr.2d 470, 12 P.3d 720.) The "more" present in this case is the overriding associational purpose behind the California Plum Marketing Program, i.e., the state's interest in maintaining orderly marketing conditions and fair prices for agricultural commodities. Accordingly, the intermediate level of review should be employed. Thus, to pass muster under article I's free speech clause, the expenditures for the generic advertising at issue must be found to be a necessary or reasonable means to achieve the program goal of maintaining and expanding the market for plums. The burden is on the state to show that the generic advertising meets this test. (Rubin v. Coors Brewing Co. (1995) 514 U.S. 476, 487, 115 S.Ct. 1585, 131 L.Ed.2d 532.)
However, due to the procedural posture of this case, there is no evidentiary record. Accordingly, there is no basis for evaluating the validity of the compelled funding at this time. Any attempt to do so would entail nothing more than conjecture and speculation. As noted by the Gerawan court, "we know not what facts may one day be proved." (Gerawan Farming, Inc. v. Lyons, supra, 24 Cal.4th at p. 515, 101 Cal.Rptr.2d 470, 12 P.3d 720.) Consequently, I would remand this case for further proceedings to develop those facts.
The majority opinion turns on the conclusion that, because a proposed marketing program must be approved by a majority of the growers, the governmental interest in the underlying regulatory program is "tenuous" and "based on findings of necessity that are wholly illusory." Consequently, the majority holds that the operation of the generic advertising portion of the Plum Marketing Program does not demonstrate the exercise of a substantial government interest. The opinion implies that the holding might be otherwise if the *672 Legislature could unilaterally impose a marketing order.
I disagree that permitting the growers to reject a proposed marketing order dilutes the governmental interest in establishing and maintaining orderly marketing conditions and fair prices for agricultural commodities. Rather, the Legislature has merely recognized its own limitations and has therefore entrusted certain aspects of the regulation of the agricultural commodities market to those who better understand the industry, i.e., those who produce or otherwise deal with such products. (Voss v. Superior Court, supra, 46 Cal. App.4th at p. 907, 54 Cal.Rptr.2d 225.) However, this recognition does not undermine the governmental interest in, and justification for, the compelled association of the growers.
In conclusion, I believe that compelled contributions to fund generic advertising should be evaluated through the use of the intermediate scrutiny test outlined above. Further, this matter should be remanded to develop a sufficient evidentiary record.
NOTES
[1] The dissent apparently would read this new framework simply as stripping the commercial/noncommercial distinction from the analysis and then applying the most relevant First Amendment test in order to determine whether a law violates article I. The reasoning of the dissent echoes a portion of Chief Justice George's dissent in Gerawan (see Gerawan, supra, 24 Cal.4th at pp. 534-535, 101 Cal. Rptr.2d 470, 12 P.3d 720). Nevertheless, it is clear that the Gerawan majority rejected the Chief Justice's suggestion that the "germaneness" test formulated by Abood v. Detroit Board of Education (1977) 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 in the First Amendment context be adopted as the relevant test for article I purposes.