[No. B147571. Second Dist., Div. Three. Dec. 20, 2002.]

TOWER ACTON HOLDINGS, LLC et al., Plaintiffs and Respondents, v. LOS ANGELES COUNTY WATERWORKS DISTRICT NO. 37, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*The following portions of this opinion are certified for publication: the Introduction, parts 1 and 2 of the Discussion, the Conclusion, and the Disposition.

**COUNSEL**

Nossaman, Guthner, Knox & Elliott, Alvin S. Kaufer, Winfield D. Wilson and Michael Heumann for Defendant and Appellant.

Robert S. Gerstein for Plaintiffs and Respondents.

**OPINION**

**CROSKEY, J.—**

INTRODUCTION

Los Angeles County Waterworks District No. 37 (District) was sued by Tower Acton Holdings, LLC (Tower) and Sierra Highway Partners, LLC (Sierra) for breach of contract and breach of the covenant of good faith and fair dealing allegedly implied by that contract. The contract in question was a master service agreement (MSA) entered into in 1989 by District and certain developers—not plaintiffs.

The MSA related to the creation of a water system (the Acton III Water Improvements), which was to be financed by bonds sold by a Mello-Roos Community Facilities District (the CFD), which the developers created and approved in order to obtain water service for their properties. The specific contractual provision allegedly breached by District was one that required District to ensure that "future development" would pay its "fair share" for the cost of building the Acton III Water Improvements.

Plaintiffs asserted they became intended third party beneficiaries of the MSA after Tower's purchase of defaulted Mello-Roos bonds, and Sierra's purchase of distressed real property subject to the Mello-Roos taxes. As property owner and bondholder, plaintiffs would benefit when anyone else was required to help pay for the Acton III Water Improvements. Property owners subject to Mello-Roos taxes benefited to the extent that the cost of the improvements were shared by more property owners; bondholders benefited to the extent that funding sources available to pay off such bonds increased.

Plaintiffs negotiated with District for a "reimbursement agreement" that would have increased the number of users subject to paying for the improvements and increased the total repayment owed to the bondholders. When District refused to agree to the terms plaintiffs wanted, they sued, contending that District had breached the MSA and the covenant of good faith and fair dealing implied therein by failing to ensure that "future development" would pay its "fair share" for the Acton III Water Improvements. Specifically, they alleged that District had acted in bad faith by unreasonably taking the position that (1) it could not agree to plaintiffs' proposed interest rate and term because it was constrained by the Public Contract Code, and (2) certain properties should not be subject to paying for the Acton III Water Improvements, because they were not *directly* benefited by the Acton III Water Improvements.

The jury returned a nine-to-three verdict in favor of plaintiffs and against District. District appeals from the resulting $10 million judgment and a postjudgment award of attorney fees entered in favor of plaintiffs. After a careful review of the extensive record, we conclude that the trial court committed reversible error when it instructed the jury that the Public Contract Code was not applicable, and admitted over objection evidence of the parties' settlement negotiations. Because such errors resulted in substantial prejudice to the District, they alone would justify reversal of the judgment. However, the judgment must not only be reversed, but judgment must be entered for District, because there was no substantial evidence presented to support a verdict that District either breached the MSA or acted in bad faith.

FACTUAL AND PROCEDURAL BACKGROUND*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

CONTENTIONS ON APPEAL*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISCUSSION

1. *The Public Contract Code, Not Mello-Roos, Prescribed the Terms of Repayment of the Funds Used to Build the Acton III Water Improvements*

■ District contends the trial court committed prejudicial error by ruling that the Public Contract Code did *not* apply to limit the length of the term and rate of interest to which District could agree, and by so instructing the jury. We agree. Article 37 of the Public Contract Code specifically limits county waterworks districts' contractual powers, including the power to enter into reimbursement agreements for "oversized" water system facilities such as the one here. Article 37 provides: "Whenever for any reason water system facilities are proposed to be installed in a district by someone other than the district itself, or the installation cost is proposed to be paid by someone other than the district itself, and the facilities are to be thereafter dedicated to the district for public use, and the board determines that it is necessary and convenient to the purposes of the district that the acceptance of said dedication be conditional upon the water system facilities being adequate to serve land other than and in addition to land proposed by the installer to be served thereby, *the board may by contract agree to reimburse and may reimburse the installer for the proportionate part of the total cost of*

---

*See footnote, *ante,* page 590.

*such water system facilities which will serve and benefit other land, upon such terms as may be agreed upon.*" (Pub. Contract Code, § 20609, italics added.)

Here, the installer was the CFD—it was the entity entitled to reimbursement, and, in fact, District had agreed to reimburse the CFD by paying to the Antelope Valley East Kern Water District (AVEK) sums attributable to the use of the excess capacity paid for by the CFD, which AVEK would then use to pay off the CFD bonds.[14] Thus, the parameter of any "agreement" or mechanism to assure that CFD was reimbursed for the cost of the surplus water units was controlled by the terms of Public Contract Code article 37.

Public Contract Code section 20609 is the *only* statutory provision related to the power of a waterworks district to reimburse an installer for the proportionate part of facilities that create surplus water capacity. Thus, section 20609 clearly applied to any reimbursement agreement designed to effectuate such reimbursement for use of the surplus capacity where: (1) the water system facilities were installed in District's waterworks district by someone other than District itself (i.e., the CFD); (2) the installation cost was to be paid for by the proceeds from CFD bonds, in other words, by the CFD—someone other than District itself; (3) the facilities were to be thereafter, and were, dedicated to District for public use; and (4) District's board determined that it was necessary and convenient to the purposes of District that the acceptance of said dedication of the facilities was conditional upon the water system facilities being adequate to serve land other than and in addition to land proposed by the installer—the CFD—to be served thereby.[15] Thus, District's board was authorized by the Public Contract Code to contract to reimburse the CFD for the proportionate part of the total cost of

---

[14]The CFD, not plaintiffs, had a right to reimbursement. Plaintiffs, of course, as bondholders and landowners subject to the CFD taxes, stood to benefit, too, because the more quickly that the CFD bonds were paid off, the more quickly the bondholders would get their money, and the more quickly the landowners would own property free of the CFD indebtedness. In turn, the CFD, and plaintiffs as persons interested therein, would be paid off more quickly if (1) the scope of location of "future development" found to be benefited by the Acton III Water Improvements was as broad as possible, and (2) the interest rate at which the price of surplus capacity increased over time was as high as possible.

[15]Plaintiffs contend that because District did not make a "formal determination" that the over-sizing of Acton III was "necessary and convenient to the purposes of the district" as required by Public Contract Code section 20609, it was making clear its understanding that section 20609 did not apply to any reimbursement agreement.

Because the issue of a formal finding being necessary to the oversizing was not raised below, we would not expect the record to contain a document proving this fact. In other words, there is no basis upon which to assume such a finding was not made, let alone that if it was not, such lack should be assumed to reflect District's "understanding" as to the applicability of the Public Contract Code—especially in light of all the evidence presented at trial that, in fact, District *did* contend that such code was applicable.

such water system facilities which would serve and benefit other land, upon such terms as might be agreed upon—but the terms to which District could agree were also circumscribed by sections 20610 and 20611 of the Public Contract Code.[16]

Section 20610 of the Public Contract Code, at all relevant times, limited the period over which reimbursement could be paid. It provided that a "reimbursement contract may provide that reimbursement will be made in periodic payments over an agreed period of time *not to exceed 10 years,* exclusively out of charges imposed upon land and collected from persons owning the land other than the land proposed by the installer to be served by the water systems facilities. The other land that may connect to and be served by the water system facilities shall be specified in the contract." (Italics added.) Thus, the reimbursement agreement proposed by Plaintiffs, which covered a period of well over 10 years, was contrary to section 20610.

Section 20611 of the Public Contract Code, at all relevant times, limited the interest rate that could be paid on reimbursement for surplus capacity. It provided that "[a]n amount attributable to interest may also be included in the contract, *at a rate not to exceed 4 percent per annum from the date of installation to the date of connection of other lands to the facilities."* (Italics added.)[17] Thus, the 13 percent compound interest proposed by plaintiffs was contrary to what section 20611 allowed.

Plaintiffs contend that Public Contract Code article 37's restrictions are inapplicable to any reimbursement agreement for these water improvements, because: (1) Mello-Roos provides that "[a] local government may use the provisions of this chapter *instead of any other method of financing* part or all of the cost of providing the authorized kinds of capital facilities and services" (Gov. Code, § 53311.5, italics added); (2) the cost of the Acton III Water Improvements was financed via a CFD; (3) Mello-Roos provides that "[*a*]*ny provision in this chapter* [i.e., chapter 2.5, the Mello-Roos Community Facilities Act of 1982] which conflicts with any other provision of law shall prevail over the other provision of law" (Gov. Code, § 53312, italics

---

[16]Sections 20610 and 20611 are both found in article 37 of the Public Contract Code, County Waterworks Districts. Article 37 applies to contracts by county waterworks districts. (§ 20600.)

[17]Public Contract Code section 20611 provides in its entirety: "Under no circumstances shall the total amount of all reimbursement payments made or agreed to be made exceed the amount, specified in said contract, for the total cost of the water system facilities exclusive of the costs attributable to the land of the installer. An amount attributable to interest may also be included in the contract, at a rate not to exceed 4 percent per annum from the date of installation to the date of connection of other land to the facilities."

added); and (4) Mello-Roos allows a CFD's board to determine, by resolution, the term and interest rate of any bonds it issues. (Gov. Code, § 53356, subds. (h), (i).)[18]

Plaintiffs then contend that "any terms conflicting with these [CFD] resolutions violate the Act." Pointing out that the CFD bonds mature in 2021 (not 2006, which marks the end of the 10-year period over which District was willing to extend the reimbursement period), and accrue 8.6 percent interest (not 4 percent), they conclude that it is clear that the Public Contract Code's restrictions cannot be imposed on Mello-Roos projects. In other words, (1) District could not in good faith claim that the terms Plaintiffs proposed were not permitted by the Public Contract Code, because they *were* permitted by Mello-Roos, and (2) a valid reimbursement agreement for a Mello-Roos-funded project could legally impose interest rates of more than 4 percent and a reimbursement period of more than 10 years.[19]

Plaintiffs' analysis is illogical. Mello-Roos applies to the *issuance of Mello-Roos bonds*. But *District* was not issuing Mello-Roos bonds. It was *repaying* the CFD (which had used the *proceeds* from Mello-Roos bonds) for the proportionate part of the total cost of the Acton III Water Improvements that would serve and benefit land not yet in the CFD, in other words, it was repaying the CFD for the cost of creating surplus water capacity that could be used by future development. Applying the Public Contract Code limitations on *repayment terms* between District and the CFD does not "conflict" with Mello-Roos by imposing any restrictions that are contrary to any *provisions* of Mello-Roos. Mello-Roos only applies to the term and interest rate on any *bonds* a CFD board issues, and has no application to the term and interest rate allowed on reimbursement agreements between a waterworks district and a CFD; the Public Contract Code only applies to the term and interest rate allowed on reimbursement agreements between a waterworks district and a CFD, and has no application to the term and interest on any *bonds* a CFD board issues.

---

[18]Government Code section 53356 provides, in relevant part: "[T]he legislative body may, by resolution, at the time or times it deems proper, provide for the following: [¶] . . . [¶]

"(h) The date or dates to be borne by the bonds and the time or times of maturity of the bonds and the place or places and time or times that the bonds shall be payable.

"(i) The interest, fixed or variable, to be borne by the bonds. . . ."

[19]Plaintiffs also urged that they had presented evidence (in the Hartley expert witness deposition) that District had previously extended the reimbursement period beyond 10 years, in other words, evidence that District believed such a term was legal. Of course, even assuming arguendo that District ever believed the reimbursement term could be more than 10 years in length, it is not bad faith, in and of itself, to change one's mind about a legal position, particularly upon the advice of counsel, and particularly when such advice is proved to be correct by an appellate court's holding.

Plaintiffs also contend that Mello-Roos prevails over the Public Contract Code because Government Code section 53312 provides that *"Any provision in this chapter* [i.e., chapter 2.5, The Mello-Roos Community Facilities Act of 1982] which conflicts with any other provision of law shall prevail over the other provision of law." (Italics added.) However, no provision of Mello-Roos conflicts with Public Contract Code sections 20609 through 20612[20] and, in fact, section 53311.5 of Mello-Roos harmonizes any other codes that, along with Mello-Roos, relate to the acquisition and financing of public facilities such as the Acton III Water Improvements. Section 53311.5 authorizes CFD's to engage in "an alternative method of financing certain public capital facilities and services, especially in developing areas and areas undergoing rehabilitation." It also specifically provides that *"The provisions of this chapter shall not affect or limit any other provisions of law authorizing or providing for the furnishing of governmental facilities or services or the raising of revenue for these purposes."* (Gov. Code, § 53311.5, italics added.) The Public Contract Code sections relied upon by District, sections 20600 through 20613, are, in fact, "other provisions of law authorizing or providing for the furnishing of governmental facilities or services or the raising of revenue for these purposes." ▉ As this court has previously noted, "we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" [Citation.]' [Citations.]" (*20th Century Ins. Co. v. Superior Court* (2001) 90 Cal.App.4th 1247, 1275 [109 Cal.Rptr.2d 611].)

---

[20]In fact, the*re is no Mello-Roos provision at all* that relates to the terms to which a waterworks district can agree when contracting to reimburse the installer of an oversized water improvement. Thus, plaintiffs' reliance at oral argument on *Voss v. Superior Court* (1996) 46 Cal.App.4th 900 [54 Cal.Rptr.2d 225] (*Voss*) is misplaced.

In *Voss*, the plaintiffs claimed that a mandatory plum marketing order issued pursuant to the California Marketing Act of 1937 (CMA) (Food & Agr. Code, § 58601 et seq.) was invalid because it failed to comply with the Administrative Procedure Act (APA) (Gov. Code, § 11346 et seq.). However, the Food and Agricultural Code section 14 provided that all such regulations should be adopted in accordance with the APA "to the extent that that chapter is not specifically in *conflict* with the express terms of the provisions of this code which authorize the adoption of such regulations. . . ." (Italics added.)

On appeal, the issue was whether the word "conflict" in Food and Agricultural Code section 14 meant either (1) a variance in how something could be done, or (2) an irreconcilable conflict, because related provisions of the APA and the CMA could "vary" without being incompatible or irreconcilable. Using legislative history, the appellate court determined that the Legislature intended the "specific conflict" to be present only when a term of the APA is found to be *irreconcilable* with a provision of the CMA.

Here, unlike the circumstances in *Voss, there is no Mello-Roos provision at all* that relates to the terms to which a waterworks district can agree when contracting to reimburse the installer of an oversized water improvement. So, there is no need to decide whether the "conflict" mentioned in Government Code section 53312 of Mello-Roos means just a variance or a real, irreconcilable conflict. There is no conflict. Mello-Roos simply does not provide for this particular scenario.

Mello-Roos even anticipated a situation such as the one here. Government Code section 53313.5, subdivision (e) provides, in relevant part, that a CFD financing the construction of water transmission and distribution facilities may enter into an agreement to convey those facilities to a public utility. The agreement for such conveyance "shall provide that the cost or a portion of the cost of the facilities that are the responsibility of the utility shall be refunded by the public utility to the district or improvement area thereof, *to the extent that refunds are applicable pursuant to* (1) the Public Utilities Code or rules of the Public Utilities Commission, as to utilities regulated by the commission, or (2) *other laws regulating public utilities*. Any reimbursement made to the district shall be utilized to reduce or minimize the special tax levied within the district or improvement area, or to construct or acquire additional facilities within the district or improvement area, as specified in the resolution of formation." (Gov. Code, § 53313.5, italics added.)

In other words, Mello-Roos itself recognized, when a CFD was reimbursed "for the cost of the facilities that are the responsibility of the utility" (in other words, for the surplus capacity not benefiting landowners in the CFD), that the extent of such reimbursement or refund is governed by "*other laws regulating public utilities.*" And the "other laws" that "regulate" what a waterworks district may do when reimbursing any entity for the cost of surplus capacity in a water system are found in sections 20609 through 20612 of the Public Contract Code.

Accordingly, the Public Contract Code's provisions *did* apply to limit the terms to which District could agree when reimbursing the CFD for the cost of the surplus capacity, and the trial court erred by instructing the jury that it did not apply. Such error permitted the jury to conclude that District's reason for refusing to agree to the terms desired by plaintiffs was pretextual and that its refusal to negotiate any other terms was evidence of bad faith. Had a proper instruction been given, it is probable that the jury would not have reached the conclusion that it did. This is so because, given the claim asserted by plaintiffs and the theory of its case that we have discussed above, the proper instruction would have made clear that not only had District not breached its agreement by adhering to the mandate of the Public Contract Code, it legally could not have done otherwise. That conclusion necessarily undermines the jury's verdict. This is sufficient to demonstrate that the erroneous instruction was prejudicial to the District, thus compelling a reversal of the judgment. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580-581 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

## 2. *It Was Error to Admit Evidence of Settlement Negotiations*

 District contends that the trial court erred by admitting, over its objections, evidence related to the parties' attempts to reach a reimbursement agreement. It relies on a stipulation between plaintiffs and District that it asserts prevented the use of any such materials at trial. We agree with District that such evidence was inadmissible.

The parties had entered into an agreement in March 1997, before plaintiffs filed their claim or complaint against District, that no materials or discussions from their negotiations could be used in subsequent litigation. The agreement provided that it would be effective "until such agreement is terminated by either party in writing." In May, before filing their claim, plaintiffs wrote to District, stating that they intended to file a claim to protect their interests, but that they continued to wish to work with District to try to resolve the parties' disputes without litigation. In fact, even after plaintiffs filed their complaint, they and District continued for several years to attempt to resolve the reimbursement issue, and exchanged various letters and drafts of possible agreements.

The trial court concluded that the agreement that these materials could not be used at trial terminated when plaintiffs filed their complaint, and that evidence of discussions after that date were admissible. This was error. The agreement provided that it would be effective "until such agreement is terminated by either party in writing," and there was no writing that terminated the agreement. Plaintiffs' complaint, although a "writing," did not state that it terminated the agreement, and there is no reason to treat the filing of the complaint as having such an effect, particularly as the parties continued to negotiate a resolution of their differences long after the complaint was filed.

Plaintiffs contend that evidence of these negotiations was admissible, regardless of the agreement to the contrary, pursuant to *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870 [221 Cal.Rptr. 509, 710 P.2d 309] and *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847 [93 Cal.Rptr.2d 364], because such evidence was offered to prove District's bad faith, not its liability. However, the parties' agreement was not worded so as to apply only to exclude evidence used to prove liability. Thus, as we now discuss, if such agreement was not contrary to public policy, it was enforceable as written. This means that evidence of the parties' negotiations should have been excluded no matter for what reason it was offered.

There is little case law on the enforceability of contracts to protect the confidentiality of settlement communications. (See Brazil, *Protecting The Confidentiality of Settlement Negotiations* (1988) 39 Hastings L.J. 955, 1026-1039 (1988) (hereinafter Brazil).) According to one commentator, the enforceability of such contracts is not always clear, because it is possible that a judge might refuse to enforce such an agreement on the ground that it provides a method of excluding evidence not specifically adopted by the Legislature (Brazil, at p. 1026), or because a judge might view it as invading a judicial prerogative, such as restricting the court's power to make sure the jury receives all evidence that will help it ascertain the truth (*ibid.*), particularly if the evidence, although contractually excluded, is relevant to prove that the parties engaged in illegal conduct or set up a relationship that violated public policy. (*Id.* at pp. 1026-1027.)

The same commentator opined, however, that confidentiality contracts that threaten none of these more compelling public policies may be as enforceable as any other contract, if the contracting parties are competent and represented by counsel, and there are not dangerous differences in bargaining power between them. (Brazil, *supra,* 39 Hastings L.J. at p. 1027.) Thus, a confidentiality contract that is not otherwise objectionable, and that supports some public policy, will be enforced. (See, e.g., *Simrin* v. *Simrin* (1965) 233 Cal.App.2d 90, 94-95 [43 Cal.Rptr. 376] [agreement by husband and wife that statements made to rabbi acting as a marriage counselor would be confidential enforced; although clergyman-penitent privilege did not apply because the rabbi was not acting as a spiritual advisor, the agreement did not violate public policy favoring attempts to preserve marital unit].)

As already suggested, however, courts will not enforce such agreements if their purpose or effect violates public policy. (See, e.g., *Mary R.* v. *B. & R. Corp.* (1983) 149 Cal.App.3d 308 [196 Cal.Rptr. 871] (*Mary R.*); Brazil, *supra,* 39 Hastings L.J. at pp. 1027-1028, fns. 402, 403 [agreement that alleged victim of child molestation by doctor would not reveal information to regulatory authorities was unenforceable as contrary to public policy; effect of agreement was to shield doctor from governmental investigation designed to protect public from professional misconduct and use of professional license to facilitate criminal conduct].) This is because a law established for a public reason cannot be waived or circumvented by a private act or agreement (*Mary R., supra,* 149 Cal.App.3d at pp. 316-317, citing Civ. Code, § 3513 and various cases), nor will a court enforce a contract made in violation of established public policy. (*Ibid.*)

Regardless of the particular facts of a case, these same principles could be applied to honor, or refuse to honor, a contract that the parties would not

disclose or admit at trial communications occurring during settlement negotiations. (Brazil, *supra,* 39 Hastings L.J. at p. 1028.) So, too, courts could apply precedents related to the enforceability of stipulations to relieve a party of an apparent contractual commitment limiting the admissibility of communications made or acts committed during the course of settlement discussions, for example, because of fraud, misrepresentation, mistake of fact, or excusable neglect, or because there has been such a substantial change in circumstances that binding the party to the stipulation would be unfair. (Brazil, *supra,* at p. 1028, fn. 404, citing *People v. Trujillo* (1977) 67 Cal.App.3d 547, 554-555 [136 Cal.Rptr. 672].)

 In this case, there is no reason that the exclusion agreement between plaintiffs and District should not be enforced. There is no evidence that the agreement was obtained by fraud, misrepresentation, mistake of fact, or excusable neglect, or that there was a substantial change in circumstances that would make enforcing the agreement unfair to plaintiffs, particularly as plaintiffs could have unilaterally terminated the agreement at any time. Nor does public policy militate against enforcing the agreement. California's public policy is to encourage settlement. (*Kohn v. Jaymar-Ruby, Inc.* (1994) 23 Cal.App.4th 1530, 1535 [28 Cal.Rptr.2d 780].) Settlement is encouraged by allowing the parties to communicate freely, without fear that their communications may be used against them if settlement negotiations are not successful. (See *Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1380-1381 [88 Cal.Rptr.2d 802].)

The admission of such evidence was prejudicial in light of the erroneous instruction that the Public Contract Code did not apply and for the same reasons. Here, given the absence of any other evidence of bad faith, it is reasonably probable that a different verdict would have resulted absent the improperly admitted evidence combined with the legally incorrect jury instruction that the Public Contract Code did not apply and counsel's argument that District's insistence that its determination of an interest rate and timeframe was controlled by the Public Contract Code constituted bad faith. (See *Soule v. General Motors Corp., supra,* 8 Cal.4th at pp. 580-581.)

3., 4.*

. . . . . . . . . . . . . . . . . . . . . . . . .

## CONCLUSION

We conclude, as a matter of law, that the Public Contract Code, not the Mello-Roos Act, limited the interest rate and timeframe to which District

*See footnote, *ante,* page 590.

could agree in connection with repaying the CFD for the Action III Water Improvements. We further conclude, as a matter of law, that the MSA imposed no duty on District to enter into a reimbursement agreement with plaintiffs instead of adopting a policy statement. The only related duty the MSA imposed on District was to ensure that "future development" would pay its "fair share," and there was no evidence that District failed to do so.

Our conclusions require that the judgment be reversed and the matter be remanded with directions to enter judgment in favor of District. We therefore need not reach or address any other issues raised and argued by the parties.

## DISPOSITION

The judgment and the postjudgment order for attorney's fees are reversed. Upon remand, all further proceedings shall be heard before a trial judge other than the judge whose judgment was reviewed in this opinion.[27] Upon remand the trial court is directed to enter judgment in favor of District, and to conduct such further proceedings as may be appropriate in light of, and consistent with, the decision and views expressed herein. District shall recover its costs on appeal.

Klein, P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied January 21, 2003, and on January 21, 2003, and January 24, 2003, the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied April 9, 2003.

---

[27]On the motion of the District, and based on the factual showing made in support thereof, we are persuaded that it would be in the interest of justice if all further proceedings in this matter were, upon remand, assigned to a new judge. (Code Civ. Proc., § 170.1, subd (c).)